**Nicholas A. PALMIGIANO, et al.**

v.

**J. Joseph GARRAHY, et al.**

**Thomas R. ROSS, et al.**

v.

**J. Joseph GARRAHY, et al.**

C.A. Nos. 74–0172 P, 75–0032 P.

United States District Court,
D. Rhode Island.

May 12, 1986.

Alvin J. Bronstein, Washington, D.C., for plaintiffs.

David Prior, Asst. Atty. Gen., Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

At issue are the remedial orders promulgated by this Court on August 12, 1977 (hereinafter, "1977 Order") resulting from a 42 U.S.C. § 1983 consolidated class action brought by five prisoners confined in the Adult Correctional Institutions; they claimed, and the Court found, that the conditions of their confinement were unconstitutional.[1] The question is whether changed conditions of confinement and the subsequent United States Supreme Court cases of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) mandate reconsideration of the aforesaid August 10, 1977 decree.[2]

---

1. *Palmigiano v. Garrahy,* 443 F.Supp. 956; No Appeal was taken.

2. The provisions of the entire order which are now being considered are:

 \* \* \* \* \* \*

 2.(b) defendants shall house pre-trial detainees in facilities which comply with the minimum standards set forth hereafter in paragraph 4, and detainees shall not be housed in dormitories;

 (c) defendants, within three months from the entry of this order, shall provide each awaiting trial detainee with recreational programs, and shall make available as soon as possible access, on a voluntary basis, to constructive work opportunities, to educational programs and to treatment programs which deal with problems associated with drug addiction, alcoholism, mental illness and physical illness or disabilities.

 \* \* \* \* \* \*

 4.(a) Defendants shall within nine months from the entry of this order, bring each building and facility under their control, particularly but not limited to the housing and food service areas of said buildings and facilities, into compliance with the minimum standards of the United States Public Health Service, the American Public Health Association, and the Department of Health, State of Rhode Island.... Implementation of this paragraph 4(a) shall include, but not be limited to, the following:

 (1) all facilities shall be adequately heated, lighted and ventilated. Windows and window panes shall be properly maintained and replaced when broken;

 (2) each prisoner shall have access to household cleaning implements and supplies;

 (3) a regular and effective program of insect and rodent control shall be undertaken;

 (4) food shall be stored, prepared and served under sanitary conditions which meet minimum public health standards. Equipment shall be maintained in good working order. Kitchen employees and prisoners shall be adequately trained and supervised;

 (5) all trash and debris shall be regularly removed from hallways, cellblocks, corridors and other common areas and trash and debris shall in no circumstances be stored or accumulated in vacant cells;

 (6) all toilets, showers and wash basins shall be properly maintained and kept in good repair. Every cell shall be equipped with a working toilet that flushes from inside the cell and with a wash basin with hot and cold running water;

 (7) no more than one prisoner shall be confined in any cell which is less than 60 square feet;

 (8) every prisoner shall be provided with a clean mattress, which meets with federal fire safety standards, and with clean bed linens, towels and soap;

 (9) each convicted prisoner housed in a dormitory shall have at least seventy-five square feet of personal living space and only those prisoners who have been classified as minimum [or Medium] Security shall be housed in dormitories; (Amended by Order, March 29, 1978).

 (10) each dormitory shall be equipped with at least one toilet to every 15 prisoners; one

In the nigh on to nine years that have elapsed since the publication of *Palmigiano* there has been an endless stream of motions and hearings; virtually all have concerned the state's failure to comply with the 1977 Order. The repetitive lament offered by the state was its inability to accomplish the ordered changes within the established time frames. And with patient confidence the Court bowed, with the same leitmotiv, continuing the matter to another day. This court was interested only in achieving the broad objective it had set rather than in imposing its preemptory power of contempt.

At a status conference held on September 25, 1984 the defendants, true to past practices, again requested that the then existing compliance and reporting deadlines be amended. Again the Court agreed. The defendants set their own dates; all existing remedial requirements were incorporated in what the Court fallaciously believed was the final order which would be satisfied within reasonable limits of the target dates. On November 19, 1984 the order issued.[3]

urinal or one foot of urinal trough to every 15 prisoners, one shower to every 15 prisoners and one sink to every 10 prisoners. Toilets and urinals shall be kept reasonably clean and in good working order.

\* \* \* \* \* \*

5.(e) In order to implement the reclassification process, defendants shall:

1. establish adult basic education programs with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in these programs on a regular basis;

2. establish pre-vocational (including remedial education) and vocational training programs, designed to enhance marketable skills, with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in said programs on a regular basis;

3. establish recreational and avocational programs with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in said programs on a regular basis;

4. develop college extension programs so that they are available to prisoners at every Rhode Island prison facility;

5. create sufficient meaningful job opportunities so that every prisoner in the Rhode Island prison system shall have the opportunity to work and every prisoner who works at a job provided by the defendants shall be compensated for all work performed;

\* \* \* \* \* \*

6. Defendants shall hire an adequate number of mental health professionals to diagnose, treat and care for those prisoners who have mental health problems.

7. Defendants shall within six months from the entry of this order bring the health care delivery system into compliance with the minimum standards of the American Public Health Association, the United States Public Health Service, and the Department of Helath, State of Rhode Island.

\* \* \* \* \* \*

9. Defendants shall within nine months of the entry of this order house all protective custody prisoners in accordance with the standards set forth for the general prisoner population in paragraph 4., and make available to protective custody prisoners the equivalent of the educational, vocational, recreational, avocational, job, transitional and community-based facility opportunities set forth in paragraph 5.

3. ORDER

On January 25, 1984, the Court entered a comprehensive order which *inter alia* detailed the progress made by the defendants in complying with the Court's remedial decree of August 10, 1977 and which set forth certain further compliance requirements and reporting and compliance deadlines. The defendants have continued their compliance efforts since January 25, 1984 and have periodically reported on same to the Court and to the plaintiffs.

On September 25, 1984, a status conference was held in chambers at which time the defendants and plaintiffs reported on the status of renovations at the Old Maximum Security facility and where the Court also had the benefit of the views of the plaintiffs' environmental health expert, as well as several of defendants' experts and the plaintiffs' expert, Theodore Gordon, has now filed with the Court a written report of his inspection of the Maximum Security facility.

At the September 25, 1984 status conference, the defendants also made oral motions to amend existing compliance and reporting deadlines, which motions were not opposed by the plaintiffs, and which the Court will grant in light of the substantial compliance efforts made by the defendants.

The Court believes it is now appropriate to incorporate all the existing remedial requirements for compliance with the August 10, 1977 order into one new order and the parties have agreed to its terms at the status conference.

On July 22, 1985 the Special Master appointed by the Court filed his Findings and Recommendations. His report showed that the defendants were not in compliance with certain provisions of the November 19, 1984 order. On September 17, 1985 another status conference was called. The Court determined that an evidentiary hearing was necessary; on September 30, 1985 it set the matter down for hearing on December 16, 1985 stating:

> The Court will take evidence on the current state of overcrowding and idleness at the Medium Security Facility, including its protective custody population, and the Intake Service Center and the impact of said conditions on the basic housing, health, environmental and safety standards which the defendants are required to meet under the prior orders of the Court.

*Findings of Fact*

a) *Overcrowding*

In the main the defendants do not controvert the essential facts nor do their experts take significant issue with those of the plaintiffs.

The prison population in the country, according to the National Institute of Justice, increased 94% from 1975 to 1980, due to population growth and sentencing practices; and it is widely accepted that crowding in prisons and jails can have negative consequences, such as riots. Rhode Island has not been immune from this phenomenon as will be seen from the facts and figures hereinafter set forth. Each section of the prison involved in this action, *i.e.* Medium Security and the Intake Service Center, will be treated separately.

1. *Medium Security*

The Medium Security section has five dormitories and two cell blocks. It is conceded that there is no overcrowding in these cell blocks. Its rated or design capacity, exclusive of 36 cells, is 186 per the 1977 Order, as against its actual population of 224. Total population, including the 36 cells, is 260 inmates. The actual population figure has varied as of certain dates: October 1, 1982—218; October 1, 1983—243;

---

It is the order, judgment and decree of this Court that:

1. The defendants' motion to extend their time to complete the renovations at the old Maximum Security facility to June 1, 1985 and to thereafter continue to use the facility for the housing of prisoners indefinitely so long as they maintain that facility in compliance with the minimum standards set forth in the August 10, 1977 order, is granted provided, however, that the defendants incorporate in their renovation and operating plans for this facility the recommendations of the environmental health expert with respect to kitchen waste disposal, kitchen ventilation, food service staff training and general preventative maintenance. Furthermore, the June 1, 1985 deadline for the completion of renovations will not apply to the Industries Building. A report detailing the status of these renovations shall be filed with the Court and plaintiffs by July 1, 1985.

2. The defendants shall be required to carry out the following other specific tasks to comply fully with the August 10, 1977 order:

a. Provide meaningful programming for pre-trial detainees in the Intake Services Center, especially for those whose stay at the detention facility exceeds 45 days by July 1, 1985;

b. Provide meaningful vocational programming opportunities in each facility of the ACI by July 1, 1985;

c. Increase industrial programming throughout the ACI, particularly in the High Security Center, Maximum Security and Medium Security by July 1, 1985;

d. Expand mental health and medical services to keep pace with population increases;

e. Reduce the number of protection custody prisoners in B–Dormitory in Medium Security or develop other protective custody housing and increase the number of jobs available for protective custody prisoners by July 1, 1985.

f. Reduce the number of prisoners in Medium Security or begin planning to increase the availability of medium-custody bedspace at the ACI through conversion or construction by July 1, 1985.

3. By November 15, 1984, the defendants shall provide the Court and plaintiffs with a formal report which details all plans, either in place or prospective, together with funding sources for the accomplishment of the tasks set forth in paragraph 2, above. In addition, the defendants shall provide the Court and plaintiffs with formal progress reports on accomplishing these tasks on February 15, 1985, May 15, 1985 and August 1, 1985.

October 1, 1984—247; October 1, 1985—264. The briefs concede there is presently no appreciable variation from the 260 figure; the briefs were submitted in February 1986.

The rated or design capacity of the Medium facility, as set at the time of construction, was subsequently increased by the 1977 Order, for which the court relied on the American Public Health Association (APHA) standards which require 75 square feet of space for each inmate in a dormitory. Now, in 1986, the defendants are housing an even greater number of inmates in the same amount of space. This changing capacity is reflected in the following chart:

| | Rated | August 10 1977 Order | Population as of Oct. 1/85 |
|---|---|---|---|
| Dormitories— | | | |
| A Dorm (3424 sq. ft.) | 38 | 45 | 43 |
| B Dorm (3424 sq. ft.) | 38 | 45 | 72 |
| C Dorm (3424 sq. ft.) | 38 | 45 | 49 |
| D Dorm (2278 sq. ft.) | 16 | 30 | 32 |
| A Honor Dorm (1584 sq. ft.) | 17 | 21 | 28 |
| Total | 147 | 186 | 224 |
| Cellblocks— | | | |
| CBS block (20 cells 42 sq. ft. each) | | 20 | 20 |
| DCB block (16 cells 45 sq. ft. each) | | 16 | 16 |
| Total | | 36 | 36 |
| Grand Totals | | 222 | 260 |

In simplest terms, this all amounts to saying that Medium Security in B, C, D and A Honor dormitories has an overpopulation of 40 men in relation to the 1977 Order. When compared to the original rated capacity, the population has increased over 50 percent.

Conditions of overcrowding here are not as severe as in the Intake Service Center; however, the extra forty men do create problems, as described more fully below. Expert testimony at the hearing revealed that the growing population at Medium has

had an adverse impact on maintenance, fire safety, and public health.

## 2. *Intake Service Center (ISC)*

The Intake Service Center holds only pretrial detainees. It has 168 cells—each having 71 square feet of space and designed to hold a single inmate. As indicated by the following table the Intake Center has been overpopulated for the past four years.

| Date | Rated | Actual |
|---|---|---|
| 10/1/82 | 168 | 183 |
| 10/1/83 | 168 | 244 |
| 10/1/84 | 168 | 317 |
| 10/1/85 | 168 | 331 |
| 11/1/85 | 168 | 347 |
| 12/1/85 | 168 | 282 |

Since 1983 the defendants have been double celling inmates, and commencing in July of 1985 triple celling occurred; however, the triple celling of inmates will not be discussed since the court enjoined such practice by its order of January 3, 1986.[4] As set forth by the plaintiffs in their brief, which I find entirely accurate, "[a]ccording to the defendants' records, during fiscal year 1983–84, there were 579 inmates at ISC who were detained more than 30 days and 298 inmates who were detained more than 60 days. (Pl.Ex. 15, Table 11). For fiscal year 1984–85, there were 645 inmates detained more than 30 days and 375 inmates detained more than 60 days (Pl.Ex. 15, Table 12). And on one unspecified day in October 1985, there were a total of 136 inmates who were listed on the 45–day roster, meaning they had been detained 45 days or longer (Pl.Ex. 14). It is inescapable that all or most of these long-time detainees were double-celled and that some of them were triple-celled."

On October 17, 1985, Patrick O. McManus, a corrections consultant, toured the ISC and found that one inmate had been there 13 months, 3 or 4 inmates 6 or 7 months, and that a stay of 3 or 4 months

---

**4.** At the evidentiary hearing, all of the experts, both plaintiffs' and defendants', agreed that triple celling was totally unacceptable in the ISC. The experts described 71 square foot cells containing a double bunk, a third mattress on the floor, an open toilet, and a desk. To go to the toilet, a pretrial detainee had no choice but to step on the mattress or the inmate, as almost all usable floor space was occupied. The problems with respect to hours of confinement, frustration, idleness, and environmental, maintenance and health impact that are discussed below as to double celling are, of course, equally applicable with respect to triple celling and formed the basis for my January order.

for an inmate was not atypical. (Tr. I—172). On that date all inmates were at least double-celled and some were triple-celled (Tr. I—163). Mr. Sanger Powers, a corrections expert called by the defense, agreed that some people were in the ISC for inordinately long periods of time (Tr. III—81), "some as long as 300–400 days with 100 days being not uncommon." (Tr. III—81–6).

This unfortunate condition is exacerbated by the incredible confinement of the inmates and the restricted physical area outside the cells. The inmates are locked in their cells 19–20 hours a day, required to eat their meals in their cells, and released only into a day room so small that only half the inmates can be there at one time and with noise levels so high as to block out normal conversation. The recreation area accommodates only 10–12 inmates—all others have to sit on a wall, steps or a picnic table in the area. Clearly, the nature of the ISC is such that it barely affords adequate space for 168 inmates, making double-celling particularly unacceptable.

The implications of overcrowding were described by the experts: it leads to tension and frustration; the potential is created for magnification of problems; small misunderstandings become large ones; retaliation becomes inevitable. Over the past three and one-half years, the rate of assaults at the ISC has increased; the level of inmate assaults on staff approximate one every two weeks. In addition, the plaintiffs' prison expert pointed out that the double-celling had a negative impact on classification because it prevented the proper separation of certain kinds of prisoners. Thus, while in pretrial detention, dangerous criminals may be bunked with those simply unable to make bail.

Not only are the pretrial detainees double-celled in 71 square feet for 19–20 hours a day (providing them with little time out or space), but the conditions go further. Predictably, the overcrowding has also created numerous environmental health problems since the ISC was designed to house no more than 168 men. The ventilation,

plumbing, noise levels, and food services are all being over-taxed with commensurate maintenance problems impacting on the general living conditions. The record shows that between January 18, 1983 and October 11, 1985, 108 health code violations were noted at the ISC, including: inadequate drainage resulting in standing pools of water in housing units; broken plumbing; ceiling holes; and numerous kitchen violations. It is even more disturbing to find that the overcrowding has created fire safety and fire evacuation problems resulting in the potential for loss of life. Finally, the plaintiffs' expert testified that the overcrowding has so overtaxed the plumbing as to cause physical deterioration and increase exposure to the transmission of infectious disease.

The current conditions cannot continue; they are unconstitutionally impermissible and will inevitably worsen if left unattended. The areas most seriously impacted by the overcrowding include programming and idleness, food services, the environmental health, medical and mental health services. I discuss each area separately below.

b) *Programming and Idleness*

In my August 10, 1977 opinion, I stated that, "... it is impossible to maintain safety, discipline and order unless a substantial portion of the population is constructively occupied, whether by work, education, vocational training or recreation. Idleness in the ACI is perhaps the central fact of existence for nearly all inmates in Medium and Maximum at nearly all hours of the day. It breeds boredom and a quest for excitement, and the defendants concede that it is a major cause of the violence which has plagued the institution for years." *Palmigiano, supra,* at 968. It is discouraging to find that virtually the same conditions still exist nine years later. Regrettably, I must conclude that the prison director, despite his other qualities, has proven woefully ineffectual in his ability to find meaningful work for the inmates. In both the ISC and Medium, overcrowding has aggravated the problem, and there is nothing in this record

indicating that prison officials have even attempted to combat idleness.

A prison expert testified that Medium had "a high fairly pervasive level of idleness... It's almost like there's a drift, that there isn't a great deal of activity going on, that most people most of the time seem to be sort of hanging around their general living areas which for the most—in the most cases are the dormitories ... in the course of really all three visits to medium security [in October and December 1985], with the exception of A honor dorm, there were a great many people simply in the living units without apparently any place to go or anything to do. For example, I remember in D dorm, which I think had 32 bunks in it, just in the dorm, I counted 22 of the inmates in the dorm at 10:45 in the morning, which would not normally be a time when you'd expect them to be in for count or lining up for meals." (Tr. I–148). As to the B dormitory which houses protective custody inmates, he said, "I had that impression (of idleness) definitely in B dormitory" (Tr. I–146). It is rightfully argued by the plaintiffs that the defendants' own data, a chart which they submitted to this Court with their May 15, 1985 compliance report, as part of a document entitled *Correctional Industries Expansion Project, May 85* indicate that at Medium 40% of the inmates are unemployed, 44% do custodial work and 16% are in industries. But even this data is misleading; for example, on October 17, 1985, 20 inmates were assigned to the upholstery shop (Pl.Ex. 13) but only 10 people were in the room and of that number only "perhaps four or five of them appeared to be actively involved in working on an upholstery project." On the same day in the auto body shop which had 14 inmates assigned according to the job roster, only four or five inmates were working.

As a trial judge I feel obliged to detail more completely the facts supporting my conclusions of pervasive idleness and lack of meaningful job assignments. I dislike paraphrasing the succinct and accurate briefing of plaintiffs' counsel and therefore simply adopt and quote: "In October, 1985,

there were 160 assigned jobs in Medium Security for a population of over 260 and 79 of these jobs were porter assignments (Stip. A.15). There were either 14 or 16 inmates assigned as porters just in B dormitory and Mr. McManus (the prison expert) could not visualize what 14 people would do in portering that particular dormitory. 'It was clear and not totally out of line that for most of the inmates, their job maybe took an hour a day. The intent, I suppose, is to give them at least the benefit of pay ... but in terms of their being meaningfully occupied for any significant portion of the day, it did not appear to be the case, and it would strike me as being extraordinary if they were' (Tr. I–147). When asked if the defendants were in compliance with that part of the Court order that required the defendants to maintain sufficient meaningful job opportunities for every prisoner, the expert responded: 'Absolutely not' (Tr. I–150). He also testified that education was not a significant activity for very many inmates (Tr. I 215–16). Mr. Powers agreed that there was a need to upgrade education opportunities and to expand vocational training and industries (Tr. III 78–9).

"Mr. McManus also testified that the idleness he observed was clearly related to the overcrowding at Medium (Tr. I 211–12) and that idleness and difficult living situations, when put together, 'are the two devils that seem to curse most correctional institutions when they're into an overcrowded situation' (Tr. I 153–54). Furthermore based upon what he was told by defendants' senior officials, there will be a reduction in industry jobs at Medium over the next 3 or 4 years during which time they will be building a new facility and the problem of idleness will get worse. (Tr. I 154–55)." Plaintiffs' Post Trial Brief pp. 18–19.

Idleness at the ISC is even worse. The plaintiffs' prison expert testified, "there is even less to do at the Intake Service Center in terms of inmate programs or jobs than there is at medium security facility" (Tr. I 173). The record shows that almost all of

the jobs are as porters; for example, in September 1985 there were 82 assigned jobs, 57 of these were porters and, at the time, the population exceeded 300. This is indicative of the existing idleness, and it does not take an expert to warn us that it is a dangerous situation. To cope with this idleness by warehousing these men for 19–20 hours a day behind bars and within 71 square feet of space violates even a modest sense of decency; double celling some of them under these conditions I find to be intolerable.[5]

c) *Food Facilities*

The impact of overcrowding was dramatically evidenced at the Center Kitchen which is the main food preparation area for the entire Adult Correctional Institution. More than fifteen different serious violations were found, all attributable to lack of basic maintenance and to overcrowding, which taxes the food services and "has had a dramatic impact on maintenance." The environmental health expert testified that, "the conditions were clearly imminent danger [to public health] in that you had all the necessary conditions for occurrence and progression of food borne diseases in addition to potential loss of life, I stated at the time I was there that it ought to be closed." (Tr. I–68).

I will not set forth in detail these kitchen conditions which even the defendants agree violated "conditions of decency",[6] because all were remedied immediately after the plaintiffs' expert's visit. The Court quite intentionally capitalizes on this situation, however, to prove the need for constant monitoring. Here a serious health threatening condition was permitted to develop and fester. The plaintiffs' expert testified that the condition he viewed must have been of longstanding duration as evidenced by the extent of the rodent droppings and the serious capital improvement problems. Yet, the state's own inspector filed only one report in a three and one-half year period, and this report, prepared only one and one-half months (October 28, 1985) prior to the visit of the plaintiffs' expert, did not focus on any of the longstanding problems or even mention rat infestation. Nothing was done about the situation until this Court reactivated the master and an inspection was conducted; suddenly the prison authority was galvanized into action and the problem was corrected in a mere 30 days.

The same is true as to overcrowding. The problem has been mounting for years. For the past three years the Master has issued repeated warnings; and in May of 1984 the Governor's own Task Force on Overcrowding said "... prison overcrowding is becoming an increasingly alarming problem" (Pl. Ex. 5, p. 5). With the exception of a future plan to build a new medium security facility, nothing has been done to cope with current conditions. As for the ISC there are no plans even "down the road."

d) *Environmental Health Problems*

The record reveals a number of conditions posing serious environmental health problems in Medium Security. These are set forth in detail in the margin.[7] The

---

5. Even the less stringent American Correctional Association (ACA) standards which the defendants seek to apply in this case require that each inmate be allotted 80 square feet of space when he spends more than 10 hours in a cell.

6. Despite my representation in the text, I will briefly list some of the kitchen conditions discovered by Mr. Theodore Gordon because they illustrate the degree to which the defendants' neglect has extended (both because of overcrowding and the absence of constant court monitoring): extensive infestation of rats, cockroaches and silverfish; the explosion of 25 to 30 cases of canned goods because of poor storage practices; cans swollen with bacteria with the potential for botulism; roof leakage; clogged drains causing water overflows; unclean can openers and ovens; evidence of rotten garbage and food spillage; a deer carcass hanging in freezer over a large puddle of blood and a half-inch thick pile of rat droppings; plywood refrigerator doors gnawed by rats; unsafe conduit lines and exposed wires.

7. Although conditions in Medium have certainly improved since 1977, there are still serious environmental health problems in the facility, most of them directly attributable to the overcrowding in the dormitories (Tr. I–21). Be-

situation at the ISC is even worse; the overcrowding has impacted on ventilation, plumbing, noise levels and food services.[8]

tween January 18, 1983 and October 11, 1985, Daniel Connery, the defendants' Environmental Health Officer, noted 115 problems needing correction at Medium Security including such problems as disconnected fire alarms, steam leaks in the boiler room, missing electrical box covers, rotted food, broken plumbing and missing ceiling panels (Stip. B.1). Of the 11 fire safety inspection reports at Medium between December 20, 1983 and October 4, 1985, 9 reported conditions such as fire doors which did not close, painted heat detectors and pull stations out of order (Stip. B.2). Mr. Theodore James Gordon, the plaintiffs' environmental health and safety expert, testified that based upon his inspection of Medium and the above history of inspection reports, the growing population at Medium had had an adverse impact on maintenance and public health and that Mr. Connery advised him that he needed additional maintenance staff because "maintenance problems increased commensurate with population increases" (Tr. I-34).

Among the environmental health problems found by Mr. Gordon at Medium during his November and December 1985 tours were:

a. the satellite kitchen's automatic dishwasher was not functioning properly as it did not reach appropriate temperatures for the sanitization of common eating and drinking utensils (Tr. I-11);

b. there was an accumulation of grease in the vent system over the cooking vats, pots and grills (Tr. I-12);

c. there were mice droppings in the food storage area (Tr. I-12);

d. although he visited and took light readings on a bright, sunny day, none of the dormitories had adequate lighting and they were all substantially below standard (Tr. I-17);

e. there is no mechanical ventilation for adequate air exchange other than opening windows in the dormitories and the more crowded the dormitory, the more serious the ventilation problem (Tr. I-14, 18–19);

f. there is a serious fire safety problem because of the time involved in getting the key to the second means of egress and the overall time taken to evacuate is too great to prevent loss of life (Tr. I-15–16);

g. the dormitory showers created pools of standing water on the floors which is a safety hazard and they are improperly ventilated, which has created mold growth and scaling paint (Tr. I-17–18);

h. the ventilation and plumbing problems were most serious in B dormitory, which is the most crowded dorm; the density of smoke was like a fog (Tr. I-20–1);

i. A Honor dorm, the smallest in area, had unclean bathrooms and various public health and fire safety problems because of the number of people confined in the small space (Tr. I-26–8);

j. cellblock South had filthy showers and wholly inadequate ventilation and lighting (Tr. I-30–1); and,

k. D Cellblock had a non-functioning ventilation system resulting in very cold temperatures, and a large hole in the shower ceiling (Tr. I-72–3).

The defendants' environmental expert, Mr. Curtis Golden, found inadequate temperatures in the dorms (Tr. III-6), inadequate lighting in the cellblocks and the dorms (Tr. III-7–8), an insufficient number of showers for the population in B dorm (Tr. III-8), fire safety and evacuation problems (Tr. III-9), and a ventilation problem caused by the crowding (Tr. III-10). (See also Mr. Golden's summary of problems in Medium at Tr. III-29).

Mr. Gordon concluded by stating that the defendants were not in compliance with the court order with respect to public health issues (Tr. I-55).

8. The following excerpt from the plaintiffs' brief comports with the record and is entirely accurate.

Between January 18, 1983 and October 11, 1985, Daniel W. Connery, the defendants' Environmental Health Officer, noted 108 health code violations at the ISC, including inadequate drainage resulting in standing pools of water in housing units, broken plumbing, ceiling holes, inadequate kitchen ventilation, uncovered trash in the kitchen and improper food storage on the floor over weekends and holidays (Stip. B.3).

In his September 19, 1985 ISC Food Service Inspection Report, in which Daniel W. Connery found 32 violations of the Health Code, Connery set forth an addendum to his report which said: "This food service operation was never designed for the type and amount of service it is being asked to perform. Unless the proper type and amount of equipment is provided, then the problems can only continue" (Stip. B.4).

Of the eleven fire safety inspection reports dated between 12/20/83 and 10/4/85, nine reported unsatisfactory conditions at the ISC, such as pull stations and smoke detectors which didn't work and alarm systems which only rang once (Stip. B.5).

Plaintiffs' expert, Mr. Gordon, testified that the overcrowding at the ISC had created fire safety and fire evacuation problems imposing the potential for loss of life (Tr. I-41-2, 136); had overtaxed the plumbing by imposing a stress that is causing physical deterioration (Tr. I-42); increased the exposure to the transmission of infectious disease (Tr. I-137); and generally overtaxed the defendants' abili-

e) *Medical and Mental Health Services*

Medical and mental health care have also suffered because of the overcrowding. In

summation, one of the experts, Dr. Frank Rundle, testified that there are "too many inmates [at the ACI] with too few staff to provide the services which are essential", and that the overcrowding exacerbates the ability to come into compliance with the standards of the 1977 Order. (Tr. II 40, 42–3). Even the defendants' expert, Mr. Richard Kiel, a medical care administrator, admitted that at least two areas of medical care delivery have been affected negatively due to overcrowding at the ACI—physical examinations and transportation of inmates to community health care specialists (Tr. III—47–8).

In the ISC there is a serious backlog of physical examinations, no tracking system to ensure that the examinations are eventually given, and a lack of many basic medical and health screening procedures—all in violation of the standards set up by this Court in its 1977 Order. (Tr. II—98; Tr. III—47, 65–6, 99–100, Stipulation C. 3 & 4; Tr. III—47, 99–100, 113–14; Tr. II—109; Stipulation C. 8).

For example, no testing for tuberculosis is being performed as required by the APHA standards. This lack of a proper program for tuberculosis detection means that the intrainstitutional spread of tuberculosis can occur undetected for years. (Tr. II–101–03). This risk is augmented by the overcrowding at the facility.

ty to perform routine maintenance (Tr. I–39–41).

Among the specific environmental health problems found by Mr. Gordon during his November and December 1985 tours were:

a. the defendants maintain no morbidity records for infectious disease which is a violation of all health codes and standards (Tr. I–45–6, 135);

b. the medical isolation cells in the infirmary had no functioning ventilation system to prevent the movement of infectious disease producing organisms out into other areas of the medical unit (Tr. I–44–5);

c. The medical isolation cells were not clean, had a very stagnant musty odor, and contained ceilings that were substandard because they did not have a smooth surface which could properly be cleaned and disinfected (Tr. I–45);

d. there was physical deterioration in the housing ceiling areas as a result of leaking waste water from heating and air-conditioning units (Tr. I–39–40);

e. the showers were leaking in all housing units and stagnant water was forming pools as well as draining towards individual cells (Tr. I–40);

f. ventilation system vents in some cells and in shower and toilet areas were clogged with dirt as a result of lack of maintenance thereby impeding air movement (Tr. I–41);

g. the satellite kitchen's dishwashing machine was not functioning properly in that it did not meet minimum temperature requirements for sanitizing common eating and drinking utensils (Tr. I–43);

h. the area surrounding the dishwasher was in a state of disrepair and there was standing pooling water (Tr. I–43);

i. there were holes in the kitchen floor with puddling of water that gave off an odor of rotten garbage resulting from bacteria decomposition of the stagnant water (Tr. I–43);

j. the kitchen had a false ceiling and not a smooth impervious surface, making it unable to be cleaned on a routine basis, which is in violation of United States Public Health Service and APHA standards (Tr. I–43–4); and,

k. the increased population had created a fire evacuation problem in that prisoners could not be evacuated in the time required by life safety code standards (Tr. I–127–9).

Mr. Golden testified that the ISC kitchen had an impermissible ceiling (Tr. III–12), that the dishwasher did not heat properly (Tr. III–2), that there were wastewater cross-connections in the kitchen (Tr. III–12), there were uncovered garbage cans (Tr. III–12), there was peeling ceiling paint in the dayroom areas (Tr. III–14), there was inadequate lighting in the cells (Tr. III–14), there was flooding around the shower areas (Tr. III–14), there were unventilated isolation cells in the infirmary (Tr. III–14), that inmates complained of the cold (Tr. III–22), and that there were fire evacuation problems caused by the overcrowding (Tr. III–27). He summarized the serious public health problems he found throughout the facility (Tr. III–29–32) and stated that nothing ameliorated the effects of double celling at the ISC (Tr. III–20).

Mr. Gordon testified that either double-celling or triple-celling at the ISC created public health hazards with a potential for loss of life (Tr. I–53–4) and concluded by saying that the defendants were not in compliance with the court order with respect to public health issues (Tr. I–55).

The record also establishes a lack of pharmaceutical and follow-up services. Inmates taking major psychotropic medications which require careful monitoring are not seen by a psychiatrist for months. Nor is there a record of those identified as psychotic or of those receiving these dangerous drugs. (Tr. II–17–19).

Many other medical deficiencies were testified to. In administration and quality assurance there is a lack of medical and mental health protocols. These protocols are necessary to provide nurses and lesser trained staff with basic guides for treatment and procedures. Also, the plaintiffs' expert found serious deficiencies in the administration of the one existing protocol—the "red tag" or suicide protocol. From the testimony, the Court's impression was that of a loose organization that did not concern itself with necessary medical statistics, formalized tracking of chronically ill and psychotic patients, or data maintenance of inmates with infectious diseases. In short, there is no smoothly functioning health delivery system.

In addition, overcrowding at the ACI has had an adverse impact on the ability to transport inmates for specialist care in the community (Tr. III—47–8, Tr. III—100–01; Stip. C. 34, 37). No disaster plan exists, no recertification or periodic updates in cardiopulmonary resuscitation are being done and added to all this, there is a lack of essential emergency equipment. Furthermore, the testimony chronicles a tale of deficiencies relative to: 1) inpatient hospitalization for the severely disturbed; 2) internal and external audits to assure quality care; 3) access to sick call services; and 4) the number of physician hours on site.

The full-time dentist is so overwhelmed that he is considering quitting (Tr. II—133). The ACI needs at least 60–70 hours per week of dental services instead of the 50 hours it is now receiving.

As the plaintiffs point out, there have been no increases in mental health staff for over three years. Consequently, there is insufficient psychiatric coverage and more psychologists are needed. Dr. Rundle recommended a full-time psychiatrist and three additional psychologists in light of the present population (Tr. II—38). The population is simply too large for the present staff.

*Discussion*

In response to the charges that overcrowding is causing serious problems at the prison, the defendants make a number of arguments. With reference to Medium Security, the thrust of their argument is that I should apply a 50 square foot allotment per inmate in the dormitories as this is the standard promulgated by the American Correctional Association (ACA). For several reasons this argument is misplaced: the 75 square feet standard is the law of the case, as will be argued *infra*, and the ACA standard allows only minimum security inmates to be housed in dormitories with a 50 square foot capacity in any single dormitory (Tr. I—203).

As to the medical and mental health system at the ACI, the defendant claims that there is no evidence proving it causally related to overcrowding. However, the defense concedes the overcrowding has caused a backlog in examination of inmates by physicians and delays "in getting patients to outside service providers in non-emergency situations." The defense then simply states, "the administration cannot meet the mandates of the 1977 court order regarding administration of Medium Security until the planned new medium [facility] is completed."

The initial inquiry to be made requires a determination of whether or not there has been a sufficient change in circumstances to warrant a modification of the 1977 Order. The defendants claim that the situation has changed significantly from 1977 and that the original decree entered in this case should be modified accordingly.

The defendants advance a two-fold argument. First, the APHA standard, setting 75 square feet of space per inmate, is not the "more widely accepted standard"; the prevalent standard is that of the ACA which sets 50 square feet as the space to

be allotted each inmate. Using this standard, the Medium Security Dormitories properly house 280 inmates and with the 36 cells the total population capacity of Medium Security Section is properly 316 instead of 229. Second, they argue that the standards of decency are not being violated because Medium is a "clean building with a well motivated staff". As to health care, the defendants say that though it may be deficient there is no constitutional violation since the crowded conditions do not adversely impact on the deficiencies except for "the stretching of their physician hours and increased inability to properly record treatment and be assured of follow up treatment where necessary". The ultimate point the defendants make is that I should not refer to the 1977 Order but rather independently determine whether the conditions as they now exist meet constitutional standards.

I note, at the outset, that no appeal was taken from the 1977 judgment of this Court nor have the defendants filed motions to modify any of the existing orders. However, in the name of equity premised on changed living conditions for the better, *i.e.* the facilities are now clean, they ask that the Court relegate the 1977 Order to the past, emasculate it of all vitality, and consider the 1977 constitutional violations "attenuated to a shadow".

The answer is clearly found in *Fortin v. Commissioner of Mass. Dept. of Public Welfare*, 692 F.2d 790, 799 (1982)

> In *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), the Supreme Court identified the conditions that warrant modification under Fed.R.Civ.P. 60(b)(5).
>
>> The inquiry for us is whether the changes [in conditions since the entry of the decree] are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years

of litigation with the consent of all concerned.

It is true, as the Department argues, that changes in the law may satisfy this standard. See *System Federation No. 91 v. Wright*, 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961). In the case before us, however, no change in the law has occurred, nor has any court interpreted the law underlying the decree in a manner different than the parties understood when they consented. The Department therefore requests in one breath that the law be re-interpreted and the decree modified because "it is no longer equitable that the judgment should have prospective application" under rule 60(b)(5). This technique, however, would transform the modification procedure into an impermissible avenue of collateral attack on the interpretation to which the parties consented. See *Ackermann v. United States*, 340 U.S. 193, 198 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950) (modification is not a substitute for appeal); *Swift*, 286 U.S. at 119, 52 S.Ct. at 464 (court may not reconsider propriety of decree as framed); *Coalition of Black Leadership v. Cianci*, 570 F.2d 12, 16 (1st Cir.1978) (rule 60(b)(5) cannot be used to vacate a decree when the legal interpretation on which it was based has not been directly overruled; proper course would have been to withhold consent and appeal any adverse judgment). Because no change was alleged, the district court properly denied the Department's motion for modification.

This matter has been in litigation for nine years; there have been innumerable conferences and hearings followed by court orders and yet the defendants are not in compliance. As stated in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)

> The question before the trial court was whether past constitutional violations had been remedied. The court was entitled to consider the severity of those

violations in assessing the constitutionality of conditions in the isolation cells.

\*     \*     \*     \*     \*     \*

We find no error in the court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.

In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation.... If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary. But taken the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.

Id. 687, 98 S.Ct. at 2571 (footnotes omitted).

Finally, the exercise of discretion in this case is entitled to special deference because of the trial judge's years of experience with the problem at hand and his recognition of the limits on a federal court's authority in a case of this kind.

Id. 688, 98 S.Ct. at 2572 (footnotes omitted).[9]

The prior judgment by this Court is the law of the case for the purposes of this compliance hearing. *Quern v. Jordan,* 440 U.S. 332, 347, 99 S.Ct. 1139, 1148, 59 L.Ed.2d 358 (1979). There is no reason to reconsider that judgment absent new evidence, a change in controlling law or the need to reconsider to prevent clear error or manifest injustice. 18 *Wright and Miller, Federal Practice and Procedure* sec. 4478, p. 790 (1981).

Of course, if an Appellate or Supreme Court decision appears directly overruling or unreconcilliable with this Court's prior opinion, then the law of the case doctrine must give way. That is not the case here. And as stated in 18 *Wright and Miller, Federal Practice and Procedure* sec. 4418, "Once final judgment has been entered as to part of the action, failure to appeal should establish a sound foundation for issue preclusion as to the balance of the action."

*Rhodes v. Chapman, supra,* and *Bell v. Woolfish, supra,* do not change the controlling law governing the constitutionality of treatment of sentenced inmates and pre-trial detainees. The specific relevancy of *Rhodes* and *Bell* centers on that aspect of the 1977 Order establishing the minimum square footage of living space each inmate must have which today is violated by double celling. In *Bell* the Supreme Court did not say that double celling *per se* was not unconstitutional nor did it say that due process is never violated by double celling pre-trial detainees when such procedures result from compelling necessities of jail administration. The Court did say, "In evaluating the constitutionality of conditions or restrictions of pre-trial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." 99 S.Ct. at 1872.

In *Rhodes,* the Supreme Court discussed the standard for determining whether conditions of confinement violated the rights of sentenced prisoners under the Eighth Amendment. While in *Rhodes* the Court found that double celling of inmates did not violate their constitutional rights, the case must be read in the context of its particular facts. The Court did not alter Eighth Amendment analysis. Totality of conditions can still have a cumulative unconstitutional effect; if they did not in *Rhodes* it

**9.** For other Circuit Court authority following these principles *see Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 174 (5th Cir.1981); *Humble Oil & Refining Co. v. American Oil Co.,* 405 F.2d 803, 813 (8th Cir.), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969); *Mayberry v. Maroney,* 558 F.2d 1159 (3rd Cir.1977); *United States v. Work Wear Corp.,* 602 F.2d 110, 113 n.

6 (6th Cir.1979); *Holiday Inns, Inc. v. Holiday Inn,* 645 F.2d 239, 240 (4th Cir.), *cert. denied,* 454 U.S. 1053, 102 S.Ct. 597, 70 L.Ed.2d 588 (1981) *Duran v. Elrod,* 713 F.2d 292, 296–97 (7th Cir.1983), *cert. denied, sub nom, Elrod v. Duran,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984); *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795–800 (10th Cir.1979).

was because only jobs and educational opportunities had been marginally diminished.

Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement, and conditions in a number of prisons, especially older ones, have justly been described as "deplorable" and "sordid." *Bell v. Wolfish, supra,* [441 U.S.] at 562, 99 S.Ct., at 1886. When conditions of confinement amount to cruel and unusual punishment, "federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–1808, 40 L.Ed.2d 224 (1974); see *Cruz v. Beto,* 405 U.S. 319, 320, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (*per curiam*). 452 U.S. at 352, 101 S.Ct. at 2402.

I, therefore, conclude that the 1977 Order finding an Eighth Amendment violation based on the totality of the conditions remains consistent with these subsequent Supreme Court cases. Consequently, the *Palmigiano* opinion and the specifics of the 1977 Order are still the law of the case and require the defendants' continuing compliance, especially absent the defendants' petition for a lifting of that order. Further, the defendants' continual failure to abide by the terms of that order and egregious if intermittent noncompliance with basic health standards, *e.g.*, the situation at the central kitchen facility, without constant, watchful monitoring raises serious questions in my mind as to whether they should yet be released from the dictates of the order.

Were I to treat the situation before me now as a new case, however, I would still reach the same result. Under the new case law, to be unconstitutional the double celling and overcrowding must impact on the basic health and safety of the inmates so as to constitute cruel and unusual punishment in violation of the Eighth Amendment. The totality of the conditions at the ISC must be viewed from this perspective.

It is easy to appreciate why in *Bell* double bunking did not constitute punishment and thereby violate the due process clause. As the plaintiffs so aptly point out, "[t]he rooms [in *Bell*] were 75 square feet and radiated from a large central 20–story multipurpose or common room to which each inmate had free access approximately 16 hours a day. And of the 398 rooms in the facility, never more than 35 were rooms in which pre-trial detainees were double bunked. 441 U.S. at 525, 99 S.Ct. at 1866. There was no evidence of any impact on basic health and safety and most inmates were detained for very short periods of time." This is dramatically different from the instant conditions; here triple celling existed for a while, inmates are confined for 20 hours a day, the environmental support system is inadequate, and most seriously the medical and mental health care is grossly inadequate; all as has been described.[10]

I have already stated why the *Rhodes* case must be read in the context of its particular facts. The facts here are significantly different because of the serious health and safety impact which has been detailed. The situation here is not merely one of pure numbers. I do not look at the overcrowding in a vacuum. The experts chronicled the problems of extensive confinement: high levels of frustration and irritation, increased assaults, high levels of idleness, serious environmental, health and maintenance problems, overextended staff, and dangerous mental and medical health practices, all of which were linked to and exacerbated by the overcrowding.

**10.** Since *Bell* and *Rhodes,* relief has been granted in prison cases by a number of federal courts. *See Toussaint v. Yockey,* 722 F.2d 1490 (9th Cir.1984); *Ruiz v. Estelle,* 679 F.2d 1115, *mod.* 688 F.2d 266 (5th Cir.1982); *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983); *French v. Owens,* 538 F.Supp. 910 (S.D.Ind.1982), *aff'd in pertinent part,* 777 F.2d 1250 (7th Cir.1985); *Martino v. Carey,* 563 F.Supp. 984 (D.Ore.1983); *Fischer v. Winter,* 564 F.Supp. 281 (N.D.Cal. 1983); *Cody v. Hillard,* 599 F.Supp. 1025 (D.S.D. 1984); *Monmouth City Correctional Inst. Inmates v. Lanzaro,* 595 F.Supp. 1417 (D.N.J. 1984); *Grubbs v. Bradley,* 552 F.Supp. 1052 (M.D.Tenn.1982); *Vazquez v. Gray,* 523 F.Supp. 1359 (S.D.N.Y.1981), and *Ramos v. Lamm,* 520 F.Supp. 1059 (D.Col.1981), *on remand from* 639 F.2d 559 (10th Cir.1980).

The record shows that for nine years this Court has employed all the artifices it could conceive to have the defendants cure the many constitutional violations it found. I have been imperious, didactic, and supplicatory; I have cajoled and waited as though for Godot. I have ever been reluctant to interfere with the operation of the prison. However, the pattern is always the same: without monitoring, prison officials permitted the kitchen to get into a deplorable state; accepting Dr. King's testimony, which I do, they failed to provide adequate medical staff for an increase in population of which they have been aware for years; indeed, repeated warnings from the Special Master have been in vain. As Dr. King pointed out, even in the areas that could easily have been corrected, nothing has been done, *e.g.*, tuberculosis is a very serious concern in prisons, yet, the detection and prevention program is woefully inadequate. The veritable fortune that has been poured into that institution will all be for naught if positive firm steps are not immediately invoked.

The overcrowding must be confronted before it becomes uncontrollable. A delay under the present conditions can give rise to problems of staggering magnitude not the least of which could be serious riots and/or a medical epidemic.

To preserve the integrity of my prior orders and prevent ongoing constitutional deprivations to the plaintiff class it is hereby

*Ordered*

### A. Overcrowding

Court imposed limitations on population are commonplace in prison and jail conditions cases. *See, Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976) (60 square feet per inmate for all Alabama prisoners required); *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983) (two stage reduction in population ordered at Michigan City, Indiana prison); *Ruiz v. Estelle,* 679 F.2d 1115, *supra* (triple-celling in all Texas prisons prohibited; double-celling claim remanded for additional findings); *Benjamin v. Malcolm,* 564 F.Supp. 668 (S.D.N.Y.1983) (emphasis added) (denying motion to modify population limit; *"an institution's ability to deliver essential services is critical in determining* whether the institution is or would be unconstitutionally overcrowded at a given level of population"); *Inmates of Allegheny County v. Wecht,* 565 F.Supp. 1278 (W.D.Pa.1983), *aff'd in rel. part,* 754 F.2d 120 (3rd Cir.1985) (population limits imposed; motion to modify limit denied); *Grubbs v. Bradley,* 552 F.Supp. 1052 (M.D.Tenn.1982) (double-celling banned in certain units at Tennessee State Penitentiary; "overcrowding is a primary source of all the most serious problems.... the only effective remedy is to reduce the prison's population..."); *Leeds v. Watson,* 630 F.2d 674 (9th Cir.1980) (cap on jail population to halt ongoing constitutional violations); *Toussaint v. Yockey,* 722 F.2d 1490 (9th Cir.1984).

### 1. Medium Security.

The defendants will come into compliance with paragraph 4.(a)(9) of the August 10, 1977 Order within ninety days, and I enjoin the defendants from exceeding the following population limits for the respective dormitories:

| | |
|---|---|
| A Dorm | 45 |
| B Dorm | 45 |
| C Dorm | 45 |
| D Dorm | 30 |
| A Honor Dorm | 21 |
| Total | 186 |

Together with the 36 cells in CBS and DCB cellblocks, which are required to be single occupancy, this places a population limit of 222 inmates, some 40 inmates above the design capacity.

### 2. The Intake Service Center.

The defendants will reduce the population at the ISC to 168, the design capacity, within six months. In the event the defendants do not reduce the population sufficiently within that time, they are enjoined from accepting any new inmates unless the population is below that population cap.

*See Campbell v. McGruder,* C.A. No. 75–1668 (D.C.D.C. 8/22/85) (stipulation reducing population with provision for automatic reinstatement of Court's July 13, 1985 order enjoining further intake if stipulated population reductions are exceeded for 48 hours); *Grubbs v. Bradley,* C.A. No. 80–3404 (M.D.Tenn. 10/25/85) (order enjoining the admission of any new or additional prisoners into state prison system except under special circumstances until population is reduced to designated capacity). *See also Pugh v. Locke, supra,* at 322 (reference to earlier 8/29/75 order enjoining any new admissions to state prison system until the population at each institution was reduced to design capacity).

### B. *Programming and Idleness.*

At Medium Security, the defendants will come into compliance with paragraph 5 of the August 10, 1977 Order by establishing sufficient educational, vocational and meaningful job opportunities for every inmate within one hundred and twenty days. At the Intake Service Center, the defendants are ordered to come into compliance within one hundred and twenty days with paragraph 2.(c) of the August 10, 1977 Order as amended, by providing meaningful programming for every inmate whose stay at the detention facility exceeds forty-five days.

### C. *Environmental Health and Safety.*

The defendants will develop a specific plan to bring themselves into compliance with paragraph 4, of the August 10, 1977 Order and to address and ensure adequacy in all aspects of the following environmental health and safety areas: staff and inmate worker training in the food service area; staff supervision; food storage, transportation and preparation; dishwashing procedures and maintenance of safe temperatures; record keeping and written policies and procedures; proper feeding of inmates in all satellite feeding operations; appropriate upkeep and cleaning of equipment and facilities; ventilation; lighting; plumbing and sanitary facilities; electrical; fire safety; general sanitation; vermin control; bedding, laundry and general preventative institutional maintenance.

### D. *Medical and Mental Health Care.*

The defendants will develop a specific plan to bring themselves into compliance with paragraphs 6. and 7. of the August 10, 1977 Order and to address needs and ensure adequacy in, *inter alia,* the following medical and mental health care areas: physician, dental, mental health, pharmacy, clerical and physician's assistant coverage; emergency care including equipment; training of medical staff and correctional officer staff in cardiopulmonary resuscitation; development of policies, procedures and protocols, data collection and tracking systems; pharmacy monitoring of medications; medical and mental health admission screening; provision of intake and routine physical examinations; referrals for specialist care; housing, assessment, and treatment of mentally disturbed and suicidal inmates; and a sick call system and follow-up procedures to ensure routine and follow-up access to medical care.

The plan will be filed with the Court, with a copy to plaintiff's counsel, within sixty days.

### E. *Monitoring Compliance*

Commencing three months after the Court order, the Special Master shall conduct quarterly inspections and prepare reports indicating the defendants' compliance with each provision of the remedial order and defendants' plans and such reports shall be provided to the Court and the parties. In conducting his inspections, the Special Master shall retain the services of experts in the fields of corrections, environmental health, medical and mental health care to assist him, as appropriate, in evaluating compliance. These inspections shall continue until further order of the Court.

Experience with the many orders that have been issued in the course of this case prompts me to note realistically that the Court is prepared to entertain a defend-

ants' motion for modification of the mandated compliance time as to any portion of this order.

As to the section of the order concerning overcrowding in the ISC (section A.2), while a population cap of 168 inmates has been imposed, the Court is not inflexible on this point. This Court is prepared to entertain a motion from the defendants requesting a reasonable adjustment as to total housing capacity.

If defendants seek such a modification, a motion must be filed within 10 days of the date of this order; absent such a motion, this order, as presently framed, will be in full force and effect.