Nicholas A. PALMIGIANO, et al.,

v.

Edward DiPRETE, et al.

Thomas R. ROSS, et al.

v.

Edward DiPRETE, et al.

Civ. A. Nos. 74–172 P, 75–032 P.

United States District Court,
D. Rhode Island.

Oct. 21, 1988.

---

Alvin Bronstein, Mark J. Lopez, National Prison Project, ACLU, Washington, D.C., for plaintiffs.

George M. Cappello, Legal Counsel, R.I. Dept. of Corrections, Cranston, R.I., David Dugan, Asst. Atty. Gen., State of R.I., Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Once again this Court is called upon to rule in order to ensure that its eleven year effort to bring the conditions of confinement at the Rhode Island Adult Correctional Institutions (ACI) into compliance with constitutional requirements is not derailed by institutional indifference and bureaucratic handwringing. The specific issue now raised by plaintiffs is whether defendants should be held in civil contempt of various orders entered by this Court establishing the precise circumstances under which pre-trial detainees are to be held in the ACI's Intake Service Center (ISC). In deciding here to exercise its broad power of contempt, this Court has finally, regretfully, reached the end of its Job-like patience with the State's inability, over more than a decade, to accomplish the agreed upon changes within established time frames.

## I. PRIOR PROCEEDINGS REGARDING THE INTAKE SERVICE CENTER

### A. The 1977 Order

The latest development in what this Court has previously termed "an endless stream of motions and hearings"[1] derives from the remedial order originally issued on August 10, 1977 (the 1977 Order) in a consolidated class action in which it was proven that the conditions of confinement

---

1. *Palmigiano v. Garrahy,* 639 F.Supp. 244, 246 (D.R.I.1986).

in the ACI were unconstitutional.[2] In issuing the 1977 Order, this Court directed sharp criticism at the Department of Corrections' handling of pre-trial detainees. Although not convicted of any crime and often held because of an inability to meet even very low bail, pre-trial detainees were mingled randomly with the most hardened sentenced offenders in the then Maximum Security Facility and were, as a result, frequent victims of the violence and fear that permeated the institution. In addition pre-trial detainees received few of the services normally incident to their situation, such as access to attorneys, mental health screening, or rehabilitative counseling and services. Indeed detainees were even forbidden from participating in any of the educational, vocational or work programs that did exist at the ACI and were thus consigned to idleness for the duration of their detention. This Court summarized the sorry plight of pre-trial detainees in 1977 in the strongest of terms:

> The conclusion is inescapable that pre-trial inmates are not provided minimally adequate protection against assault, that they are exposed to punishment even worse than that endured by other inmates, and that they are incarcerated under conditions far harsher than anything necessary to guarantee their presence at trial.

*Palmigiano v. Garrahy,* 443 F.Supp. at 971.

To alleviate the fear and suffering of pre-trial detainees, the 1977 Order required the State to remove all such persons from the existing Maximum Security Facility within three months and to house them separately thereafter, with no subsequent intermingling or contact between detainees and sentenced prisoners. The defendants were further ordered to provide pre-trial detainees with relief from the general squalor besetting the prison, housing them in facilities which complied with certain minimum standards with regard to heating, lighting, ventilation, cleanliness, pest control, food service, sanitation and space. Included among these physical conditions requirements was the order, motivated by the Court's concerns for the physical safety of pre-trial detainees, that such persons never be housed in dormitories. Finally, the defendants were ordered to provide detainees with recreational programs, constructive work opportunities, educational opportunities and treatment programs for drug addiction, alcoholism, mental illness and physical illness or disabilities. *See generally id.* at 986–87. No appeal was ever taken by defendants from any of these requirements.

## B. The Emergence of Overcrowding at the ISC

Despite the explicit terms of the 1977 Order and the three-month timetable that it announced, it was not until five years later, in July 1982, that the State succeeded in achieving full compliance with the Order's requirements for the housing of pre-trial detainees. With the opening of the ISC in 1982, however, detainees were at last no longer intermingled with sentenced offenders and the constitutionally required physical conditions imposed by the 1977 Order were momentarily met. Nevertheless old problems persisted and new problems loomed. In a "final report" on compliance with the 1977 Order issued on October 20, 1983, the Special Master appointed by the Court to monitor the ACI noted that adequate programming was still not being provided in the ISC for pre-trial detainees. As troubling was the Special Master's report of overcrowding in the newly opened facility. On the day it was first occupied, one hundred of the ISC's 168 single occupancy cells were already fitted with double bunks, and the facility's population consistently topped 200. At the time of the Special Master's report, nearly 250 detainees were being held in the ISC, and all concerned conceded that the magnitude of the overcrowding problem would only continue to grow.

---

**2.** *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I. 1977). This Court is also mindful of the fact that the *Palmigiano* decision was preceded by nearly a decade of litigation over conditions at the ACI. *See Morris v. Travisono,* 310 F.Supp. 857 (D.R.I.1970) and progeny.

Clearly defendants knew as early as 1983 that serious overcrowding was endemic at the ISC and that aggressive steps must be taken to avert a crisis in the not too distant future. Yet despite the Special Master's explicit warning, defendants have repeatedly failed to be proactive about solving the problem. Instead the State has fallen into a frustrating pattern of doing too little too late, and then only after prodding by this Court. On January 25, 1984, for example, the Court found that defendants were still not in compliance with the programming requirements of the 1977 Order and ordered them to provide meaningful programming at the ISC, especially for those detained more than 45 days, and to expand mental and physical health services to keep pace with population increases, all to be accomplished by July 1, 1985. In addition, defendants were explicitly directed to address the overcrowding problem. Four months later, then Governor J. Joseph Garrahy, cognizant of the growing problems of the state's corrections program, appointed the Governor's Task Force on Prison Overcrowding to study the situation. Although the Task Force eventually recommended reducing the prison population through a broad range of reforms that touched upon every aspect of the criminal justice system, from bail to parole, the State acted to adopt fully only one of the Task Force's recommendations[3] and took no steps to deal effectively with overcrowding at the ISC. Confronted with yet another minimally productive interlude in the long struggle to improve conditions in the prisons, this Court reissued its January 1984 order on November 19, 1984 and added the requirement that the State also provide meaningful vocational opportunities throughout the ACI, again by July 1, 1985.

### C. The December 1985 Evidentiary Hearing and Subsequent Orders

With the arrival of the July 1, 1985 deadline for conforming the conditions of confinement in the ISC to the requirements of the 1977 Order, plaintiffs requested that the Court undertake a detailed review of the facility. The resulting report of the Special Master, issued July 22, 1985, documented for the fifth time the State's failure to provide the programming repeatedly ordered for pre-trial detainees, and further reported that overcrowding at the ISC had, as anticipated, grown dramatically worse. In strong, unambiguous language, the Special Master exhorted the State to act immediately to resolve these problems:

The past seven months have brought no abatement to the inexorable expansion of population at the ACI.... [T]he population of the Intake Services Center (ISC) for pre-trial detainees and newly admitted convicted offenders has increased from its 1983 size of 250 to 327, an alarming 30 percent growth. While the ISC is a modern, modular structure, it was designed to house 168 prisoners. Thus, it is within nine bodies of reaching 200 percent of capacity. Virtually every cell in the facility has been double-bunked and there is simply nowhere else to put people.

... [A]s little as a 20 percent increase in the number of detainees will require *triple-celling,* a condition sure to breed all sorts of trouble and woe. Pursuant to the recommendations of a state-wide task force on overcrowding, the defendants have undertaken an effort to work with the courts to review bail-setting practices and screen more carefully accused offenders remanded to the ACI. The need to expedite this work is imperative.

Special Master's Findings and Recommendations, July 22, 1985.

Responding to the concerns raised by the Special Master, this Court held an evidentiary hearing in December 1985 to examine the overcrowding crisis at the ISC and its impact on the basic conditions of confinement at the facility. The evidence adduced at the hearing painted a disturbing portrait of life inside the over-stuffed facility. *See generally Palmigiano v. Garrahy,* 639 F.Supp. 244 (D.R.I.1986). As predicted by the Special Master, double celling of in-

---

**3.** The only Task Force recommendation adopted was to construct a new medium security facility at the ACI. Special Master's Memorandum, September 26, 1988.

mates in the ISC's 71 square foot cells had been replaced by triple celling beginning in July 1985, and many triple-celled detainees were long-term residents of the facility whose stays exceeded 45 days. Exacerbating the effect of these cramped living quarters was the incredible confinement of the inmates. Detainees were locked in their cells 19–20 hours a day, required to eat meals in their cells and permitted release time in a day room so small that noise levels prevented normal conversation. As a consequence of such claustrophobic conditions, the rate of assaults at the ISC had increased, a situation exacerbated by the intermingling of truly dangerous detainees with individuals simply unable to make bail. In addition, the overcrowding had over-taxed the ISC's ventilation and plumbing systems, overwhelmed its food, medical and mental health services, and strained fire safety and environmental health systems to the breaking point.

In rapid succession, the Court entered two orders designed to ameliorate the devastating impact of overcrowding on living conditions at the ISC. On January 3, 1986, responding to the testimony of both plaintiffs' and defendants' experts that triple celling was totally unacceptable, the Court absolutely forbade this practice at the facility. *Id.* at 248 n. 4. Finally, on May 12, 1986, the Court entered a more comprehensive Opinion and Order (the May 1986 Order), branding the conditions at the ISC "unconstitutionally impermissible" and requiring defendants to take drastic steps to bring an immediate end to violations at the facility. *Id.* at 258–260. Among its requirements, the 1986 Order instructed defendants to reduce the population at the ISC to 168, the design capacity, within six months, enjoined them from accepting any new inmates unless the population fell below the 168 cap, again required them to provide meaningful programming for every person whose stay at the facility exceeded 45 days, and ordered defendants to develop specific plans to bring their environmental health and safety practices and their medical and mental health care systems into compliance with the 1977 Order. Particularly noteworthy, in light of the fact that

this Court is today faced with even more severe overcrowding at the ISC, is the frustration so unmistakably expressed in the May 1986 Order at defendants' refusal to respond effectively to what were then decade-old problems:

> The record shows that for nine years this Court has employed all the artifices it could conceive to have the defendants cure the many constitutional violations it found. I have been imperious, didactic, and supplicatory; I have cajoled and waited as though for Godot. I have ever been reluctant to interfere with the operation of the prison. However, the pattern is always the same: without monitoring, prison officials permitted the kitchen to get into a deplorable state ... they failed to provide adequate medical staff for an increase in population of which they have been aware for years; indeed, repeated warnings from the Special Master have been in vain.... even in the areas that could easily have been corrected, nothing has been done.... The veritable fortune that has been poured into that institution will all be for naught if positive firm steps are not immediately invoked.

> The overcrowding must be confronted before it becomes uncontrollable. A delay under the present conditions can give rise to problems of staggering magnitude....

*Id.* at 258.

Wearily, I must confess that I am today at a loss to know how much clearer this Court can be. The problems to which defendants are required to respond have been known for years. Defendants have had explicit notice both as to what constitutes an impermissible level of overcrowding and what is expected of them by this Court. The time that they have had available to devise and implement effective plans to overcome the ISC's problems has been enormous. Yet eleven years after the original order, five years after overcrowding was first identified as critical at the ISC, and more than two years after the 1986 reaffirmation of this Court's entire course of dealing in this case, defendants are still

frozen in place, unable or unwilling to generate an effective response; and incredibly there is even more to this trail of broken promises and dashed hopes.

Mindful of the social, political and economic forces arrayed against the Department of Corrections in its effort to comply with the Court's commands, this Court indicated in the May 1986 Order that it would be receptive to defendants' requests for modification of the mandated compliance times or for reasonable adjustments of the population cap imposed on the ISC. The Court's posture was at that time, as it has always been and continues to be, one of concern for achieving the broad goals of the original order, not of making unreasonable or unrealistic demands on state prison authorities. Accordingly, to accommodate defendants' subsequent pleas for more time to address the overcrowding problem, the Court modified the May 1986 Order on June 26, 1986 (the June 1986 Order) so that, effective July 1, 1986, defendants were permitted to house up to 250 pre-trial detainees in the ISC. In addition, however, the Court insisted that defendants adhere to a schedule for reducing the population of the ISC from this absolute maximum to its design capacity of 168 by October 1, 1988. The Court's Order also enjoined defendants, in the event that they failed to meet any of the scheduled reductions, from accepting any new detainees until such time as they were able to satisfy the applicable cap. However, the Order further provided that defendants might move for permission to maintain the 250 population cap at all times if they could establish their ability to house that number of detainees while satisfying the requirements of the 1977 Order and relevant constitutional standards. Finally, the Court banned double celling at the ISC, effective July 1, 1986, unless and until defendants were able to provide each double-celled detainee at least ten hours a day out of his cell. No detainee could be double-celled for more than 30 days, however, regardless of how much time he spent out of his cell. As in 1977, defendants again took no appeal from any of the Court's 1986 orders.

### D. The 1987 Consent Decrees

Optimism reigned briefly in October 1986 when the Special Master reported that defendants had in fact met the 250 population cap by July 1, 1986 as ordered. More significantly, the Master also found that the reduced population, combined with other improvements made at the facility, had alleviated the physical and programmatic violations previously found at the ISC. Success was short-lived, however. On June 9, 1987 (the June 1987 Order), the Court found defendants to be in violation of the June 1986 Order requiring the phased reduction of the population at the ISC and again enjoined them, effective August 1, 1987, from exceeding the 250 population cap. The Court also specified that, if defendants failed to meet the August 1987 deadline, a fine of $3,000 would be imposed for each day that the failure continued.

Despite this threat of serious financial penalties, defendants never succeeded in complying with the terms of the June 1987 Order. Finally, on July 28, 1987, faced with defendants' obvious inability to control population levels and their continuing pleas for more time to plan meaningful responses to overcrowding, the Court tried a new tack. Rescinding the June 1987 Order, the Court persuaded plaintiffs to abandon, if only temporarily, their reliance on a numerical population ceiling and to substitute instead a conditions-driven monitoring regime. The basic assumption of this new scheme was that conditions, not numbers per se, render a detention facility constitutional or unconstitutional. Thus defendants were ordered to remedy within 30 days any deficiencies in the conditions of confinement remaining at the ISC, most notably in the medical and mental health services areas. Should defendants succeed in rectifying such deficiencies in the time allowed, the Court would view the facility as meeting constitutional standards and the 250 population cap would be lifted. If, on the other hand, defendants failed to rectify the deficiencies on time, the population cap would stand. Additionally, since overcrowding had repeatedly been shown to be associated with the unconstitutional deteri-

oration of conditions at the ISC,[4] any population increase over the 250 cap would continue to serve as a warning signal to the parties and would trigger expert review of the facility. More specifically, if the population at the ISC exceeded a monthly average of 265 for two consecutive months, a panel of three experts would immediately conduct a review. Similarly, if the ISC population subsequently reached 280 for two months in a row, and at any time thereafter if it increased by another ten detainees for two consecutive months, expert review would be triggered. In any case, three experts would routinely conduct semi-annual inspections of the ISC. The July 1987 Order was entered with the consent of all parties.

By late 1987, the population of the ISC had resumed its inexorable climb. Indeed so rapid were the increases that experts were soon scheduling virtually back-to-back reviews. Finally grasping the fact that they had no choice but to develop additional housing space for pre-trial detainees, de-

fendants at last broached plans to convert portions of the Pinel Building (also known as the ISC Annex) for such use. On October 6, 1987, with the population count standing at 311, this Court entered yet another order, this time requiring defendants to submit by October 20, 1987 a written plan for reducing the population at the ISC. Among the points that the Court ordered defendants to specifically address in the plan were the opening of the Pinel Building to house up to 60 pre-trial detainees, and defendants' long-range capital development program for dealing with the ongoing population explosion at the ISC.

As had happened so often in the past, October 20, 1987 came and went, and defendants once again petitioned this Court for an extension of time. Ever patient, the Court again agreed on December 16, 1987 (the December 1987 Order), this time permitting unlimited double celling at the ISC, effective from October 28, 1987 through January 1, 1988. Once again, however, the Court imposed a scheduled reduction in

---

**4.** Since the issuance of *Palmigiano v. Garrahy,* 639 F.Supp. 244 (D.R.I.1986) in 1986, this Court has consistently articulated the causal relationship that exists between overcrowding and the persistence of unconstitutional conditions · of confinement at the ISC. In 1986, for example, I said:

> The situation here is not merely one of pure numbers. I do not look at the overcrowding in a vacuum. The experts chronicled the problems of extensive confinement: high levels of frustrations and irritation, increased assaults, high levels of idleness, serious environmental, health and maintenance problems, over-extended staff, and dangerous mental and medical health practices, all of which were linked to and exacerbated by the overcrowding.

*Id.* at 257. Again in the July 1987 Order I explained:

> Because the Court's continuing intervention in the ACI must be keyed not to numbers but to the conditions that in their totality violate the constitutional rights of prisoners, the parties agreed to the necessity of developing a system of review that focuses primarily on conditions. This focus on conditions, however, should not obscure the Court's experience in the long history of this case, which illustrates clearly that excessive numbers lead almost ineluctably to the rapid deterioration of conditions.

July 28, 1987 Order. The critical point is simply this: Time and time again, experts involved in this case have demonstrated the link between overcrowding and unconstitutional conditions of confinement. There can be no question at this point in the long history of this case that the two are inextricably interwoven. Based on this well-documented relationship, and in light of defendants' own admissions that the design capacity of the building imposes an upper limit on the number of individuals who can be housed safely and humanely in the ISC, this Court has ruled that triple celling is absolutely forbidden at the facility. *Id.* at 248 n. 4. This order, coupled with a standing order against dormitory housing of pre-trial detainees, establishes a theoretical upper limit on the population of this particular facility of 336, the number that would be present if every individual were appropriate for double celling. Most significantly, however, the parties to this action have repeatedly agreed, and it has been so ordered by this Court, that 250 is the population at which the right of the plaintiffs to humane conditions of confinement consistent with constitutional requirements can be fairly balanced with the societal demand placed upon the Department of Corrections to provide housing for growing numbers of pre-trial detainees. Having worked out, over many years, a fair and reasonable measure of the ISC's carrying capacity that comports with constitutional standards, this Court need not now stand idly by waiting for disaster to befall an impermissibly overcrowded facility.

population on the ISC: By January 1, 1988, defendants were to make 60 beds available at the Pinel Building and to reduce the population at the ISC to 276; by March 1, 1988, defendants were to make an additional 30 beds available at the ISC Annex and were to further reduce the population of the ISC to 250, where it was to remain. To ensure the success of this Order, the Court also required defendants to present, on or before April 1, 1988, a concrete plan spelling out how it intended to keep the population level of the ISC at 250 after the March 1988 deadline. Failure to comply with this Order, the Court warned for a second time, would result in the imposition of heavy and substantial monetary sanctions. As in July 1987, the December 1987 Order was entered with the agreement of the parties.

### E. The January 1988 Chambers Conference

In December 1987 and January 1988, in keeping with the Court's policy of continuing review, the Special Master's corrections, medical and environmental experts [5] undertook an inspection of the ISC to determine if the facility conformed with constitutional standards. Viewing the site at times when the population fluctuated between 253 and 276 detainees, these experts identified a number of continuing problems, among them insufficient outdoor recreation space, inadequate and unacceptably noisy day room space, insufficient space to allow all detainees to eat at clean tables out of their cells, too few showers for the detainee population coupled with inadequate hot water for the facilities that did exist, leaking toilets, lavatories and showers, unsound mattresses and pillows, inadequate ventilation, inadequate lighting, broken smoke detectors, limited work opportunities, inadequate medical coverage, too few social workers, and a complete absence of preventive maintenance. Despite the strains on the facility evident at the population levels observed, levels far below the ones we are dealing with today, the Special Master reported to this Court in

January 1988 that conditions at the ISC generally passed constitutional muster. This circumstance, coupled with the timely opening of the promised two wings of the Pinel Building and attendant dip in the ISC's population, prompted the Court to convene a chambers conference on January 28, 1988 to explore a redefinition of the Court's role in the case.

Discussion at the conference centered on the procedures to be followed in the future given the then current status of the ISC as a constitutional facility. Although the Court expressed the view that the burden should now fall on plaintiffs to petition the Court if they felt that the facility was reverting to unconstitutional conditions of confinement at or near the 250 population cap (Tr. 11–13), the Court left undetermined what the implications of a substantial escalation of the population at the ISC would be (Tr. 12 and 23–24). Instead the Court reaffirmed the appropriateness of the 250 population cap (Tr. 12) and explained to defendants that it was equally their burden to come into court and seek modification of the cap if they thought modification warranted by changed circumstances (Tr. 44). In short, despite the exploratory tone of the conference, there can be no doubt that the Court left undisturbed the December 1987 Order (Tr. 12 and 41–43). Thus, at the conclusion of the chambers conference, the following provisions of that Order remained standing: that by March 1, 1988 defendants would make a total of 90 beds available at the Pinel Building, at which time the population cap at the ISC would be fixed at 250; and that by April 1, 1988 defendants would file with the Court a long-range plan incorporating future initiatives to further reduce the population at the ISC. In addition, the parties agreed in principle that after March 1, 1988 the Special Mastership would be terminated; that plaintiffs would, in the future, take the initiative to institute actions if they felt constitutional standards were again being violated at the ISC; and that

---

**5.** Dr. Armand Start inspected the ISC on December 1–2, 1987 for medical deficiencies, Ward Duel on January 11–12, 1988 for environmental health and safety violations and Jacqueline McMickens on January 13–15, 1988 for corrections problems.

defendants would, in the future, be required to take the initiative to seek modification from the Court of the 250 population cap (Tr. 42–45). Before, however, the agreements reached at this conference could be promulgated as an order, plaintiffs, responding to defendants' failure to adhere to the 250 cap after the March deadline for stabilizing the population at the ISC, entered a motion for an order to show cause why the defendants should not be held in civil contempt.

### F. The July 1988 Show Cause Hearing and Subsequent Developments

On July 21, 1988, this Court held an evidentiary hearing to consider plaintiffs' contempt motion. That defendants had routinely exceeded the agreed upon population cap of 250 was never in doubt; at the hearing, defendants stipulated to persistent, intensive overcrowding at the facility (Stips. A.1, A.2, A.3, A.4 and A.5). The average daily population of the ISC in May, for example, was 325, in June slightly over 338, and in the first twenty days of July just below 350 (Tr. 10, 84). Thus not only were defendants exceeding the 250 population cap, but they were also, beginning in June 1988, routinely exceeding the full double-celling capacity of the facility. In addition, plaintiffs alleged, and defendants conceded, that during this same period of time pre-trial detainees were being bunked dormitory-style in multi-purpose rooms and in the library in violation of the 1977 Order (Tr. 83–87, Stip. A.6), and some individuals were being double-celled in excess of 30 days in violation of the June 1986 Order (Stip. A.7). For their part defendants took the position that, despite the numbers, conditions at the ISC were constitutional, that the numbers were beyond their capacity to control and that, as always, more time was needed for dealing effectively with overcrowding at the facility.

Since the July hearing, the pre-trial detention population of the ACI has virtually exploded. According to the defendants'

own daily population reports submitted to the Special Master and the Court, an unprecedented 452 pre-trial detainees were housed in the ISC and ISC Annex on September 22, 1988, 396 of whom were crammed into the ISC itself. Yet only six days later, on October 2, 1988, the population had surged upward to a new high of 564, 450 of whom were now housed in the ISC. ACI Daily Population Report. Nor are these figures atypical. Between July 21, 1988, the day of the evidentiary hearing, and October 6, 1988, the last day for which this Court has received an updated report, the population at the ISC dipped below the double-celling capacity of 336 for only four days and has routinely topped 400 since mid-September.[6] Given the facility's double-celling capacity of 336 and assuming no triple celling, a population like that reported on October 2, 1988 means that the facility is operating at 80% above the agreed upon population cap of 250 and 34% above its double-celling capacity, with dozens of individuals impermissibly stacked in the library and multi-purpose rooms of the facility. In addition, a population grown to this size means that the ISC's mechanical systems, food services, medical facilities and recreational facilities are all being operated at more than 250% of their design capacity. Nor is there any relief in sight. Although defendants met the April 1, 1988 deadline for submitting to this Court a long-range plan addressing overcrowding in the ISC, the construction of two 96 bed additions to the facility announced in that report is presently being delayed by negotiations between the City of Cranston and the State of Rhode Island over approval for the construction of a new Medium Security facility. Indeed in his July 21, 1988 testimony, Director Moran conceded that completion of this expansion project is at least two to three years away (Tr. 92–93), while projected increases in the capacity of the Pinel Building are one to two years off (Tr. 91). In addition, anti-drug legislation introduced in the last session of the General Assembly authorized

---

6. This analysis is based on ACI Daily Population Reports supplied to the Special Master for all days in the time period in question except August 26, September 1, September 15 and September 28, 1988.

increased use of pre-trial detention in drug-related cases. Yet even as policymakers and state courts continue to deluge the state prison with pre-trial detainees in unprecedented numbers, little attention has been paid in Rhode Island to the kind of interim modular housing projects and pre-trial alternatives, among them pre-trial diversion programs, pre-trial release programs for non-violent petty offenders held for want of nominal bail, bail funds, community-based detention programs, and house arrest programs, that have been used in other states to relieve pressure on the prison system. As the public clamor for tough anti-crime measures continues to mount, the overcrowding crisis that the Rhode Island prison system is struggling with today can only grow worse.

This Court is thus faced with a gordian knot. On the one hand, there can be no doubt, given the facts of this case, that the Department of Corrections has engaged in the most torpid imaginable response to the problem of overcrowding at the ISC. At virtually every point in the long history of this case, the Department has relied on the complexity of the problems, which this Court has never denied, as an excuse to plead for more time. Yet despite this Court's generosity in being responsive to these pleas, year after year has passed and still the Department has failed to make convincing efforts to implement viable solutions. On the other hand, however, other state actors have repeatedly tripped the Department up by continuing to make decisions that overwhelm the halting efforts the Department has made to cope with the situation. As quickly as the Department finds or creates new space for pre-trial detainees, the cumulative effect of state executive, legislative and judicial action or inaction over-fills the ISC again. Lacking

focused attention to the problem, the left hand has ever succeeded in undermining what the right hand has accomplished.

Despite my empathy for the problems faced by the State in its efforts to cope with what I know are very difficult problems, and despite my respect for the progress the State has made in dramatically upgrading its prison facilities in the years since this case was first filed, certain facts must not be forgotten: In 1977 defendants were permanently enjoined from housing pre-trial detainees in dormitories. In January 1986 defendants were permanently enjoined from triple-celling detainees in the ISC, and were further ordered in June 1986 never to double-cell detainees unless such individuals were able to spend ten hours per day out of their cells, and even then for not more than 30 days. Finally, in 1987 defendants agreed to a population ceiling of 250 at the ISC. These remain the standing orders of this Court with regard to the problem of overcrowding at the ISC, orders devised with the involvement of the parties and with the requirements of the United States Constitution in mind. Whatever my sympathies with the problems faced by these defendants, the fact remains that I cannot allow these orders, rational and fair directives worked out over years with defendants' participation and consent, to be ignored.

## II. FINDING OF CONTEMPT

### A. Clear and Convincing Evidence of Violation

The plaintiffs have moved the Court to adjudge the defendants, Honorable Edward DiPrete, Governor of Rhode Island, and John J. Moran, Director of the Rhode Island State Department of Corrections,[7] to be in civil contempt of three standing or-

---

7. I would note that these defendants are clearly responsible for implementing the orders which plaintiffs allege have been violated. State law in Rhode Island explicitly charges them with responsibility for the operation of the Department of Corrections: "All functions, services, and duties of the department of corrections shall be organized by the director with the approval of the governor according to the following divisions: (a) Adult services shall include but not necessarily be limited to the administra-

tion generally and specifically of the state's correctional institutions, work release programs and other similar or appropriate functions as determined by the director with the approval of the governor...." R.I.Gen.Laws Sec. 42–56–4 (1984). Therefore, these defendants are responsible for ensuring that the facilities operated by the Department function in compliance with this Court's Orders of August 1977, June 1986 and December 1987.

ders of this Court governing the housing of pre-trial detainees at the ISC. First, plaintiffs allege that the defendants are grossly exceeding the population limit of 250 at the ISC, in violation of the Order entered by agreement of the parties on December 16, 1987.[8] Second, plaintiffs allege that defendants have not limited double celling as they were ordered to do on June 26, 1986;[9] the specific allegation is that defendants are double-celling detainees for more than 30 days and are not providing double-celled detainees with at least ten hours out-of-cell time each day. Plaintiffs' third allegation is that defendants are housing pre-trial detainees in dormitories at the ISC, violating the standing order of August 10, 1977.[10]

■ To establish civil contempt, a complainant must show by clear and convincing evidence that a specific order of court has been violated. *See AMF Inc. v. Jewett*, 711 F.2d 1096, 1100 (1st Cir.1983); *Burke v. Guiney*, 700 F.2d 767, 769 (1st Cir.1983). The evidence presented at the July 1988 show cause hearing, reviewed at pages 15–16 above, unquestionably supports plaintiffs' first and third allegations. Defendants stipulated to population statistics which demonstrated that they seldom, if ever, complied with the population limit in May 1988 and never complied in June 1988 (Stips. A.1, A.2 and A.3). Defendants also stipulated that detainees were housed in dormitories in May, June and July of this year (Stip. A.6). Plaintiffs' second allegation was proven in part and refuted in part. Director Moran testified that double-celled detainees were in fact being provided with ten hours out-of-cell time each day (Tr. 91), in accord with the June 1986 Order, but

defendants admitted that during May and June 1988 certain pre-trial detainees at the ISC were double-celled for more than 30 days (Stip. A.7), in direct violation of the June 1986 Order.

**B. "Substantial Compliance" Standard**

■ A finding of civil contempt must be based not on a mere violation of a court order but on a party's failure to achieve substantial and diligent compliance in meaningful respects with what the court has ordered. *Ruiz v. McCotter*, 661 F.Supp. 112 (S.D.Tex.1986); *Aspira of N.Y. Inc. v. Board of Educ.*, 423 F.Supp. 647 (S.D.N.Y.1976). The standard to be used in evaluating the actual performance of an alleged contemnor against the performance ordered is "substantial compliance." *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d 790 (1st Cir.1982). The First Circuit has recognized that "[N]o particular percentage of compliance can be a safe-harbor figure, transferable from one context to another. Like 'reasonableness,' 'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which non-compliance affects that interest." *Id.* at 795. In this case, the interest at stake is nothing less than the lives and safety of hundreds of persons, on any given day, who are awaiting trial, held by the State not because they have been found guilty of any crime, but because they could not put up the money for bail or because bail has not been set. Over the history of this case, the Court has received credible testimony,[11] corroborated by reports of the Special Master and his experts,[12] about the

---

**8.** The December 1987 Order provided: "On March 1, 1988, Defendants shall make available thirty additional beds [for a total of ninety beds] at the Pinel Building (ISC Annex) at which time the population ceiling at the Intake Service Center shall be reduced to 250."

**9.** The June 1986 Order stated: "Commencing July 1, 1986, no inmate shall be double-celled at the ISC unless that inmate is provided with at least ten hours each day out of his cell and no inmate shall be double-celled for more than thirty days."

**10.** The August 1977 Order stated: "[D]etainees shall not be housed in dormitories." Paragraph 2(b), 443 F.Supp. at 986.

**11.** Evidentiary hearing, Dec. 1985, testimony of Theodore J. Gordon, Patrick D. McManus, and Dr. Frank Rundle, summarized in *Palmigiano v. Garrahy*, 639 F.Supp. 244 (D.R.I.1986).

**12.** Special Master's Final Report on Compliance with the Aug. 10, 1977 Order, Oct. 20, 1983; Special Master's Findings and Recommendations, July 22, 1985; Special Master's Tentative Findings and Recommendations, Oct. 3, 1986; Special Master's January 1988 Report, summar-

effects of overcrowding. Of greatest concern to this Court is the likelihood of violent loss of life or serious physical injury for detainees and prison personnel resulting from overcrowding beyond the limit set for this particular facility.[13]

Defendants' violations of these Orders are not minor technicalities. In the past four months, defendants have never once complied with the population cap and have repeatedly violated the double-celling limit and the prohibition against housing pre-trial detainees in dormitories. This Court would not entertain a motion for contempt if the population exceeded the cap by several persons overnight or over a weekend. Here, however, the population at the ISC has pushed the facility to the bursting point. Defendants' performance simply cannot be termed "substantial compliance" with the orders of this Court. Given the magnitude of these violations, proven by

undisputed evidence, the Court must take the serious step it does today.[14]

## C. Contempt of a Consent Judgment

■■ The fact that one of the orders at issue here was a consent judgment in no way effects the ability of the Court to enforce it through a finding of civil contempt. The population cap of 250 was ordered with the agreement of the parties. The fact that defendants consented to this limit does not entitle them to transgress it now. A consent judgment is a judicial act with the same force and effect as a judgment rendered following a contested trial. *Inmates of Boys' Training School v. Southworth*, 76 F.R.D. 115, 123 (D.R.I. 1977). The efficacy of a consent judgment rests on the consenting parties' compliance with its terms. The First Circuit has noted that consent decrees, when entered into by private parties, are often viewed as contracts, *United States v. ITT Continental*

izing the findings of medical, corrections and environmental experts.

**13.** This Court has never held that overcrowding per se is impermissible at the ISC. Rather I have always reasoned that certain levels of overcrowding, established over the years by expert testimony at numbers well above the facility's design capacity, create an impermissible risk to pre-trial detainees' constitutional rights. Throughout the long history of this case, I have emphasized and reemphasized plaintiffs' constitutional right to be reasonably free from the threat of violence while held by the State, a right recognized by the First Circuit. *Lovell v. Brennan*, 728 F.2d 560, 564 (1st Cir.1984) (prison inmates have a constitutional right "to be reasonably free from violence and the threat of violence while incarcerated"), *aff'g Lovell v. Brennan*, 566 F.Supp. 672 (D.Me.1983). I have carefully grounded this Court's orders related to the housing of pre-trial detainees in this right. *See, e.g., Palmigiano v. Garrahy*, 443 F.Supp. at 970–71 and *Palmigiano v. Garrahy*, 639 F.Supp. at 247, 249, 258. That the ISC was, in January 1988, in compliance with many of the orders of this Court regarding conditions of confinement in no way alters the well-documented correlation between overcrowding and violence at the ISC nor relieves defendants of their responsibility to house pre-trial detainees in circumstances that guarantee, as much as possible, their safety. Director Moran's July 1988 testimony that there had been no increase in discipline problems or the rate of assault when the ISC neared its double-celling capacity last June (Tr. 80–82) provides little reassurance to this Court when faced

with the extreme overpopulation levels that have become the norm at the facility since that hearing. Instead the long-established view of this Court, that specific levels of overcrowding at this particular facility are inherently dangerous to detainees' well-being, remains unchanged.

**14.** The First Circuit approved a district court's decision to hold public officials in contempt in a situation similar to the one presented here. *Massachusetts Ass'n of Older Americans v. Commissioner of Pub. Welfare*, 803 F.2d 35 (1986). A class action challenged certain practices of the Department of Public Welfare, which the District Court ordered the Department to change. Two years later, the plaintiffs asked the District Court to hold the Department in contempt, alleging that the Department had failed to obey one provision of the Court's order for several months and had never complied with another provision. The District Court found that the Department was not adhering to the terms of the order and held the Commissioner of Public Welfare in civil contempt. On appeal, the First Circuit affirmed the decision and stated its opinion regarding a litigant in the position of defendants here: "If the Commissioner of Public Welfare felt that those terms [of the Judgment] were inappropriate, he should have sought relief in the form of modification of the Partial Final Judgment under Federal Rule of Civil Procedure 60(b). The district court did not abuse its discretion by enforcing compliance through the contempt sanction and remedial order." *Id.* at 41.

*Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), but that "programmatic decrees in public law litigation may call for somewhat more flexible interpretation in light of the need to achieve their basic purposes (the eradication of unconstitutional conditions) and the need to accommodate the differing competencies of different branches of government as well as the differing needs and interests of the parties." *Massachusetts Ass'n for Retarded Citizens v. King*, 668 F.2d 602, 607–08 (1st Cir.1981). The First Circuit's rationale for this distinction was stated this way: "A civil finding of contempt in the private context essentially triggers a payment of money damages as in garden variety tort or contract litigation. There is no risk of the kinds of societal disruptions that may be threatened in the public law context where judicial discretion may well be crucial to securing complex legal goals." *AMF Inc. v. Jewett*, 711 F.2d 1096, 1101 (1st Cir. 1983).

No one who studies carefully the long history of this case can fail to see how flexibly this Court has treated its own orders precisely because it has the utmost respect for the "differing competencies of different branches of government as well as the differing needs and interests of the parties." For these reasons, I have modified and amended the orders at issue today so often that I have lost count, and always in response to defendants' pleas for flexibility. There comes a time, however, when flexibility must give way to enforcement lest one party's failure to comply undermine the viability of the agreement which the parties reached and the Court approved as a workable solution to the problems presented.

Defendants agreed to the provisions of the December 1987 Order on October 28, 1987, thereby committing themselves to achieving compliance with this population cap. The decree was not expressed in terms of hopes or suggestions. Defendants did not agree only to try; they agreed to bring the facilities under their supervision into compliance with the consent decree. Defendants have not petitioned for modification of the decree although this might have provided an opportunity for the Court to restructure it to accommodate defendants' problems before they reached this critical point.

Finally, this Court sees that its decision to adjudge defendants in contempt is necessary to head off a "societal disruption" of serious magnitude. Only an order holding these defendants in contempt will spur them out of the bureaucratic quicksand in which they have become mired, and force them to take the action necessary to meet the standards established in the consent decree.

### D. Basis of This Contempt Order

■ This Court bases its decision on the defendants' violations of the August 1977, June 1986 and December 1987 Orders, violations of ever-increasing magnitude. The opprobrious condition of cramming as many as 450 persons into a facility which, in the extreme, can only house 250, is potentially explosive. It is a disaster waiting to happen and mandates action by this Court. The law of civil contempt empowers me to decide this motion now without waiting for some catastrophe to occur as a result of the overcrowding. The 1987 consent decree enables me to enforce the standards to which defendants themselves agreed, standards which may in fact be higher than the minima assured by the United States Constitution. The defendants have not complied with these standards and the plaintiffs now ask the Court to compel defendants' compliance. I do so not only because plaintiffs are entitled to the "benefit of the bargain" they struck with defendants, but because the danger of serious harm to detainees and prison personnel, and perhaps the loss of lives, loom on the horizon.

The purpose of judicial intervention in a case such as this is not simply to prevent isolated instances of misconduct. The court's duty is to remove a threat to constitutional values posed by the manner of operation of the institution. See *Battle v. Anderson*, 708 F.2d 1523, 1538 (10th Cir. 1983), citing Fiss, *The Supreme Court, 1978 Term—Foreword: The Forms of Jus-*

*tice,* 93 Harv.L.Rev. 1, 22–23 (1979). Judicial remedies in such cases typically take the form of prospective injunctions supported by continuing oversight to assure compliance. As one scholar noted, "The court's jurisdiction will last as long as the threat persists." Fiss, *supra,* at 28.

Here, past unconstitutional conditions at the ISC threaten to recur. As the number of detainees increases, the ability of the Department of Corrections to house these people safely and humanely in the space available diminishes. This Court feels it is crucial to enforce compliance with the Orders at issue to stave off impending disaster.

## III. DEFENDANTS' DEFENSES

In their Post–Trial Memorandum of Law, defendants readily conceded that this Court has great discretion in holding a party in civil contempt for violations of its own orders, citing *United States v. Rhode Island Dep't of Employment Sec.,* 619 F.Supp. 509 (D.R.I.1985) for authority (D. Memo. 14). Instead defendants argued, as they did at the July 21, 1988 hearing, that the Court should stay its hand in light of the good faith efforts that they have made over the years to cope with the overcrowding problem at the ISC and the improvement that they have achieved in the overall conditions of confinement at the facility. In addition, plaintiffs addressed in their Post–Trial Memorandum of Law a third defense not actually raised by defendants, that of factual impossibility of compliance (Pl. Memo. 18–21).

### A. Good Faith

■ Defendants' claim that they have made good faith efforts to comply with the orders of this Court simply does not provide a valid defense to plaintiffs' motion. In elaborating the law of civil contempt, the Supreme Court long ago established that a defendant's motive for doing a prohibited act cannot relieve him of responsibility for the violation. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). The Court derived this rule from the very na-

ture of civil contempt as "a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Id.* at 191, 69 S.Ct. at 499. *See also, e.g., Maggio v. Zeitz,* 333 U.S. 56, 68, 68 S.Ct. 401, 407, 92 L.Ed. 476, 486 (1948); *Penfield Co. v. Securities & Exch. Comm'n,* 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117, 91 L.Ed. 1117 (1947). Given the broad remedial purpose of the contempt power, the *McComb* Court reasoned, it is of no consequence why defendant did what he did, only that he failed to act in accordance with an order of a court. This analysis has been followed repeatedly in the First Circuit. In *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare,* 692 F.2d at 796, for example, the Circuit said flatly "good faith is not a defense to civil contempt." *Accord Donovan v. Enterprise Foundry,* 751 F.2d 30, 38 (1st Cir. 1984); *NLRB v. Maine Caterers, Inc.,* 732 F.2d 689, 690 (1st Cir.1984). Consequently, although this Court acknowledges the efforts that defendants have made to bring the ISC into compliance with its orders, the bare fact that efforts have been made is not the issue here. That the facility is not in substantial compliance with a standing order of this Court is our principal concern today.

### B. Constitutionality of Conditions

■ Defendants' second argument, that they have succeeded through diligent effort in bringing present conditions at the ISC into compliance with constitutional requirements, is no more compelling. A contempt motion presents the issue of whether the standing orders of this Court will be enforced; it does not provide an opportunity for collateral attack on the judgment underlying the orders. The Supreme Court long ago fixed the boundaries of this kind of action:

> It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The proce-

dure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.

*Maggio v. Zeitz,* 333 U.S. at 69, 68 S.Ct. at 408, 92 L.Ed. 476. *See also United States v. Rylander,* 460 U.S. 752, 756–57, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983) (reaffirming the principle enunciated in *Maggio* ).

As plaintiffs accurately point out in their Post–Trial Memorandum, federal courts called upon to enforce court orders in prison overcrowding cases have recently found that the principle articulated in *Maggio* applies with special force when the underlying judgment is by consent (Pl. Memo. 21). In August 1988, for example, the Circuit Court for the District of Columbia, in dismissing the District's attempts to evade responsibility for violating the terms of a consent decree on the ground that the prison in question was currently operating as a constitutional facility, said flatly:

> The District's argument that the conditions at Central do not implicate the Eighth Amendment is of no avail. The District voluntarily agreed to the terms of the consent decree in lieu of litigating the constitutional issues raised by appellees' complaint. The requirements of the decree, not the Eighth Amendment, are the measure of the District's responsibilities. The District cannot unilaterally alter the terms of the decree in its endeavor to erect a defense to the contempt motion.

*Twelve John Does v. District of Columbia,* 855 F.2d 874, 878 n. 3 (D.C.Cir.1988). *See also, e.g., Ruiz v. McCotter,* 661 F.Supp. 112, 116 (S.D.Tex.1986) (in civil contempt proceedings arising from defendants' noncompliance with several previous orders in prison reform action, district court concluded that "questions concerning the constitutionality of the Texas prison system are not under consideration at the present juncture; rather, the matters in dispute relate to allegations of contumacy by TDC with respect to specific provisions of prior orders"). Accordingly, this court need not reach defendants' Eighth Amendment defense.

Assuming for the moment, however, that defendants' Eighth Amendment claim were not wholly irrelevant to the present action, defendants' articulation of this defense, relying as it does on *Inmates of Occoquan v. Barry,* 844 F.2d 828 (D.C. Cir.), *reh'g denied,* 850 F.2d 796 (1988) (en banc), adopts a theory not appropriately applied to this case. Specifically, defendants seem to be arguing that this Court does not have the power to enforce a population cap on a prison facility operating, as the ISC was found to be in January 1988, in a constitutionally acceptable manner. Setting aside the fact that the *Occoquan* decision addresses the constitutional rights of convicted prisoners rather than those of pre-trial detainees, defendants clearly misapprehend the principles enunciated in the case by the Court of Appeals for the District of Columbia and thus overstate its implications for this action.

In *Occoquan,* the Court of Appeals reviewed the District Court's imposition of a population cap on each of the nineteen units within the Occoquan facility and its requirement that the District of Columbia reduce the total number of prisoners held at the prison. *See Inmates of Occoquan v. Barry,* 650 F.Supp. 619 (D.D.C.1986). Noting that the District Court had held not that overcrowding at Occoquan offended the Eighth Amendment, but rather that overcrowding exacerbated the effects of deficiencies in the prison's environmental, fire safety, medical and mental health systems which, taken together, violated the Constitution, the Court of Appeals concluded that the District Court's use of its equity power to institute an absolute population limit at Occoquan was not tailored narrowly enough to remedy the specific problems identified. In the words of the appellate court:

> In our view, immediate resort to a population cap was much too blunt an instrument in view of the court's specific findings of "deficiencies".…

*Inmates of Occoquan v. Barry,* 844 F.2d at 842.

In the Rhode Island District Court's view, there is a crucial difference between imposing a population cap as a cure-all for unconstitutional conditions of confinement as the District Court did in *Occoquan*, and enforcing a population cap determined over the course of protracted, complex litigation and adopted by the parties as one element of a carefully tailored remedy specifically addressed to each of the deficiencies affecting a facility, as has transpired in this case. Because we are dealing in this case not with "too blunt" a judicial remedy but with a sharply focused consent decree and orders that have emerged out of years of negotiation between the parties, defendants' reliance on the very different reasoning of the *Occoquan* opinion is clearly misplaced.[15]

## C. Impossibility

 Finally plaintiffs correctly point out that a finding of civil contempt can be deflected by a showing that compliance with the court's order is factually impossible. *See United States v. Rylander*, 460 U.S. at 757, 103 S.Ct. at 1552, 75 L.Ed.2d 521. The logic of the impossibility defense is inherent in the very nature of civil contempt. The purpose of the sanction is, as noted above, to compel a reluctant or recalcitrant party to comply with a judicial order or voluntary agreement. If he is literally unable to do so because compliance is not presently within his power, the attempt at coercion embodied in a finding of contempt is meaningless. *See Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); *Maggio v. Zeitz*, 333 U.S. at 69, 68 S.Ct. at 408, 92 L.Ed. at 487 (contempt order should issue "only when it appears that obedience is within the power of the party being coerced by the order"). A defendant claiming impossibility, however, bears a heavy burden

of production, *see, e.g., United States v. Rylander*, 460 U.S. at 757, 103 S.Ct. at 1552, 75 L.Ed.2d 521; *United States v. Fleischman*, 339 U.S. 349, 362–63, 70 S.Ct. 739, 746, 94 L.Ed. 906 (1950); *Maggio v. Zeitz*, 333 U.S. at 75–76, 68 S.Ct. at 411–12, 92 L.Ed. 476, and this burden is especially difficult to meet in cases where the needs of petitioners are urgent. *See Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d at 797.

 Federal courts applying the test of impossibility to the conduct of state officials in prison overcrowding cases have been particularly strict in their interpretation of this defense. The Western District of Michigan, for example, has interpreted factual impossibility to mean "that there are no steps [defendants] can take within their lawful authority to maintain uncrowded conditions at the Consent Decree institutions." *United States v. State of Michigan*, 680 F.Supp. 928, 1053 (W.D.Mich.1987) (holding prison officials, corrections commissioners and Governor in contempt for failing to comply with consent decree regarding overcrowding after determining that defendants had at least five measures they could take to relieve overcrowding). Similarly, the Second Circuit has stated that defendants' already heavy burden of proof is further heightened where prison officials have engaged in a "long history of delay" in confronting an overcrowding problem. *See Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (holding correction officials in contempt for exceeding population cap established by consent decree when political difficulties and possible conflict with state courts were only reasons cited as making compliance impossible). *See also Twelve John Does v. District of Columbia*, at 877–

---

**15.** As I note above, the Court of Appeals for the District of Columbia addressed the precise issue raised in this case in *Twelve John Does v. District of Columbia*, 855 F.2d 874 (D.C.Cir.1988), decided four and one-half months after *Occoquan*. In *Twelve John Does*, the Circuit Court affirmed the lower court's decision to hold the District of Columbia in contempt for failing to comply with the terms of a consent decree

which adopted a population ceiling at the facility in question. Juxtaposing *Occoquan* with *Twelve John Does* makes clear that the District of Columbia Circuit draws the same distinction between imposing a population ceiling in response to allegations of Eighth Amendment violations and enforcing a population cap adopted by the parties.

78 (rejecting impossibility defense where District had for years failed to take steps to eradicate prison overcrowding problem); *Tate v. Frey,* 673 F.Supp. 880, 882–83 (W.D.Ky.1987) (rejecting defendant corrections officials' impossibility defense based on large increase over six year period in number of state-held prisoners and the legislature's failure to supply sufficient additional beds).

Unquestionably the many factors that led the several courts cited above to hold state or local officials in contempt for failure to abide by self-imposed population caps are all present in this case. The Rhode Island State Department of Corrections and the Governor have had unequivocal notice of the overcrowding problems at the ISC since at least 1983. It goes without saying that, had defendants made a sincere and timely effort to address the problem six years ago when it was first identified, or even four years ago when it was first closely analyzed in the 1984 report of the Governor's Task Force on Prison Overcrowding, defendants would not be in the sorry situation they find themselves in today. Given this long history of delay, it is disingenuous for defendants to continue to plead that the problem has grown too overwhelming to deal with after systematically refusing to address this visibly brewing crisis for so long. Such a blatant attempt to avoid responsibility for their own patently apathetic behavior will not, at this late date, rescue them from its consequences.

Additionally, Director Moran's suggestion, made in the January 1988 chambers conference (Tr. 43), and repeated by Attorney Dugan in the July 1988 evidentiary hearing (Tr. 24), that corrections officials are powerless to control the actions of the legislature in passing no bail statutes for alleged drug offenders and other high profile suspects also fails to establish factual impossibility. The presumption underlying this argument is that the ISC is overcrowded because it is being stuffed with such no bail offenders by state judges acting upon legislative mandates. Yet at the July 1988 hearing, plaintiffs' corrections expert presented data showing that 24% of the detainees held at the ISC and the ISC Annex on May 9, 1988, were being held on bond of $5,000 or less and thus represent a pool of offenders who might be appropriate for participation in pre-trial release programs, were such an alternative available in Rhode Island (Tr. 35–43). The viability of such an approach to relieving pressure on the ISC has since been confirmed in statistics supplied to the Special Master and the Court. According to these statistics, of the 517 detainees held at the ACI on September 26, 1988, 51 of the 68 being held on cash bail were being detained on bail of less than $1,000, and another 132 detainees were being held on surety bail amounting to $5,000 or less. In other words, 200 (38%) of the total population of pre-trial detainees listed for that day were potential candidates for pre-trial release. In the face of such statistics, I do not see how these defendants can assert that they are doing everything in their power to cure overcrowding at the ISC.

Furthermore, the Second Circuit has already provided the answer to the Department's implied concern that corrections officials are powerless to control the bail setting and sentencing practices of state judges. In response to defendants' argument that they lacked the power to turn away pre-trial detainees committed to their care by the state courts, and thus were being forced by state court practices to overcrowd their prisons, the *Badgley* court explained that the Supremacy Clause is a complete defense to any attempt by state courts to hold corrections officials in contempt for violating state court orders in an effort to comply with conflicting federal court requirements. *See Badgley v. Santacroce,* 800 F.2d at 37–38. *See also Twelve John Does v. District of Columbia,* at 878.

Finally, defendants are clearly not faced with financial impossibility, given the legislature's appropriation of $16.5 million to expand the ISC (Tr. 76–77).

In pointing out here the options potentially available to defendants, this Court does not mean to suggest how they should go about solving the overcrowding prob-

lem. Indeed Supreme Court precedent clearly indicates that the choice of solutions in a situation such as this must be left to qualified state officials, who are entitled to great deference in the administration of state prisons. *See Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Instead I am merely endeavoring to make clear that viable options are available and to express emphatically that the time for selecting among these alternatives is long since past. In urging these defendants to take the initiative to solve the overcrowding problem at the ISC, I am certainly not blind to the political problems that they will face in working to implement solutions. However, the realities of the political process do not excuse the Governor and the Director of the executive branch's Department of Corrections from their responsibility for taking the lead in this area. If we have learned nothing else from the tortuous history of this case we have surely learned that remedying the problems of this State's prisons requires focused, aggressive attention of the kind that can only come from the highest officer of the State. Defendants must begin immediately to fashion short-range solutions while simultaneously working to devise more permanent answers. This Court would much prefer to see defendants act to bring the ISC into compliance with the orders in question than to employ its own power to require defendants to devise and implement a release program for pretrial detainees when the number held in the ISC exceeds the population cap.

In sum, given the existence of several possible solutions to the overcrowding problem at the ISC, and given defendants' failure to come to grips with the need to vigorously pursue such options despite six years of prodding from this Court, an impossibility defense is completely unavailable to them in this case.

## IV. RELIEF

Plaintiffs have proven by clear and convincing evidence numerous and continuing violations of the Court's Orders by these defendants. Plaintiffs' motion for adjudication of civil contempt is accordingly granted.

■■■ This Court is mindful that the purpose of civil contempt is not to punish for past non-compliance but to secure future compliance with orders of the court. Plaintiffs have argued, and this Court agrees, that a finding of civil contempt, without coercive sanctions, would be meaningless in this case. Measures short of coercive sanctions have repeatedly proven ineffective to spur these defendants to action. In selecting the sanctions to impose, this Court has followed the command of the Supreme Court: "It [the court] must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

■■■ Accordingly, the Court feels it most expedient at this point to coerce compliance with its past orders through the imposition of a fine. Defendants were put on notice ten months ago that this Court intended to use fines, if necessary, to enforce its orders. In its order of December 1987, this Court warned defendants that "Failure to comply with this Order [mandating the reduction of the population at the ISC to 250 by March 1] shall result in heavy and substantial monetary sanctions against the defendants." (December 1987 Order, p. 3). I recognize that the final burden of this fine will fall on the taxpayers of Rhode Island if the defendants fail to comply with the Court's orders by the date specified. However, I must impose these fines in order to force defendants to deal immediately with the overcrowding crisis.[16] The consequences of not coming

---

**16.** Plaintiffs have recommended that any fines collected should be used to finance a bail fund which would pay the bail of low-bond pre-trial detainees under certain terms and conditions to be developed later. While the Court sees much

merit in this plan, it reserves judgment as to whether it will order such a bail fund. Developing such a system would require the attention of defendants, and might divert them from imple-

to grips with the problem now will impose a far greater loss, counted in dollars and lives, in the future.

IT IS HEREBY ORDERED that defendants, Governor Edward DiPrete and Director John Moran, are in contempt of court for having failed to comply with the following provisions contained in standing orders of this Court: the prohibition against housing detainees in dormitories, the limitation on double-celling any pre-trial detainee for more than thirty days, and the population cap of 250 persons at the ISC.

IT IS FURTHER ORDERED that defendants shall file with the Court by November 21, 1988 a specific and detailed plan, to be approved by the Court, which will ensure that the population of the present 168-cell ISC will be maintained at no more than 250 persons, that dormitory housing of detainees will cease, and that no detainee will be double-celled for more than thirty days. This plan must describe how the Department of Corrections intends to house its detainee population in the next twelve months. The plan must consider, at a minimum, the rate of increase in the number of detainees in recent months, the total number of detainees expected to be housed, the predicted security classifications of those detainees, the restrictions ordered by this Court, and the conditions of confinement.

IT IS FURTHER ORDERED that defendants may purge themselves of contempt by implementing, by February 20, 1989, the above-mentioned plan to: 1. reduce the population at the ISC to no more than 250 persons; 2. refrain from housing pre-trial detainees in dormitories; and 3. double-cell no pre-trial detainees for more than thirty days.

IT IS FURTHER ORDERED that if defendants fail to file a plan with the Court by November 21, 1988, or if they fail to bring the ISC into compliance with the court orders by February 20, 1989, fines will accrue at the rate of $50 per day for each detainee held in the ISC in excess of the 250 population limit. At a population level of 450, the defendants would incur a fine of $10,000 each day.

If the overcrowding crisis persists in spite of these sanctions, the Court will reconsider its selection of sanctions.

menting a more comprehensive solution to the overcrowding crisis.