April 15, 2024

**Supreme Court**

No. 2022-59-Appeal.
(PJ 21-1688)

In re N.D.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re N.D.                              :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.**  The petitioner, the Department of Children, Youth, and Families (DCYF), appeals from an order of the Family Court granting the motion of the respondent, the Court Appointed Special Advocate (CASA), to adjudge DCYF in contempt on behalf of N.D.[1] for violating an order to place N.D. in a residential facility that was appropriate for her level of need.  DCYF argues that the hearing justice erred in: (1) rejecting its defense that it was unable to comply with the court's order; (2) imposing a contempt sanction that was designed to punish rather than coerce DCYF into compliance; and (3) ordering that the contempt sanction be placed in a trust for N.D.'s benefit.  For the reasons set forth herein, we vacate the order of the Family Court.

---

[1] N.D. was a minor during the lower court proceedings.  We refer to her using her initials to respect her privacy.

**Facts and Travel**

N.D. became involved with DCYF when the Pawtucket police found her with a scarf around her neck, tied to a curtain rod. At the time, N.D. was sixteen years old. Initially, N.D. was permitted to remain at home with a safety plan in place, but on February 15, 2021, she locked herself in the bathroom and cut herself, requiring twenty-one sutures.

N.D. was subsequently admitted to Bradley Hospital, where she attempted suicide multiple times and was often restrained by staff. Believing that N.D.'s parents could no longer provide her with a minimum degree of care or supervision, DCYF filed a dependency petition on May 25, 2021. Thereafter, the Family Court granted DCYF temporary custody of N.D. She was originally placed at the North American Family Institute,[2] but she continued to struggle with self-harm and was sent to Hasbro Children's Hospital (Hasbro) three times due to self-inflicted injuries. N.D. was re-admitted to Bradley Hospital on June 27, 2021.

By July 2021, N.D. was ready for discharge, and DCYF began issuing referrals for placements. Due to N.D.'s high level of need, she required placement in a psychiatric residential treatment facility. DCYF first looked for in-state placements, but to no avail. DCYF expanded its search to the New England area,

---

[2] The North American Family Institute is a multi-service, multi-state agency that operates residential, foster care, and community-based programs in Rhode Island. *About*, NAFI Rhode Island, https://www.nafiri.org/about/ (last visited Apr. 3, 2024).

but several of DCYF's typical providers were not accepting new admissions and others had extensive waiting lists. Meanwhile, N.D. began to grow frustrated about her extended stay at Bradley Hospital. She expressed that, despite engaging in treatment, she felt "like [her] head[] [was] underwater and [she was] just barely breathing." At the September 14, 2021 pretrial conference, the hearing justice noted that "out of state and in state referrals have thus far been unsuccessful[,] additional out of state referrals have been made * * *." On September 22, 2021, and September 27, 2021, N.D. was brought to the Hasbro emergency room due to self-harm. At the October 6, 2021 pretrial conference, the hearing justice noted that "the placement search shall be expanded greatly * * *." He further noted that N.D. had regressed.

By November 2021, N.D. had improved. She had not been physically restrained since November 11, 2021, and had not been given intramuscular injections to calm her down since October 3, 2021. At the November 9, 2021 pretrial conference, the hearing justice noted that she was once again ready for discharge and instructed that N.D. be placed in an appropriate residential treatment facility. Upon learning at the December 1, 2021 pretrial conference that DCYF was still unable to find an appropriate placement, the hearing justice expressed his frustration noting, "I'm a broken record – [o]rder a national search [and] report back." On December 6, 2021, a written order was entered memorializing the November 9, 2021

directive that N.D. "be placed forthwith in a residential treatment facility that is appropriate for her level of need."

The same day, CASA, on behalf of N.D., filed a motion to adjudge DCYF in willful contempt of the court's order because she remained at Bradley Hospital and was "at risk [of] decompensating due to the length of stay at [the] hospital." Thereafter, the hearing justice conducted an evidentiary hearing on CASA's motion. At the hearing, DCYF conceded that it had not complied with the Family Court's December 6, 2021 order and that N.D. remained at Bradley Hospital. Nevertheless, DCYF argued that the hearing justice should deny CASA's motion because it was not possible for the agency to comply with the court's order.

The hearing justice heard testimony from two witnesses: Heather Warner, Ph.D., an administrator in the children's community services and behavioral health division of DCYF, and Jennifer Sevigny, a social caseworker for the family services unit at DCYF, who was assigned to N.D.'s case. Doctor Warner testified to the efforts that she and her staff had undertaken in finding N.D. an appropriate placement. She first looked for in-state placements; but because of N.D.'s aggression and self-injurious behavior, there were no placements in Rhode Island that could meet her level of need. Doctor Warner testified that there were two placements in Rhode Island available to boys with N.D.'s level of need, but that

there were no similar placements available for girls.[3]  She stated that, at the time of the hearing, there was a proposal to build a new psychiatric residential treatment facility in the state.  Nevertheless, until a new facility is built, there are no psychiatric residential treatment facilities for young girls in Rhode Island.  Doctor Warner testified that DCYF typically uses out-of-state placements for girls with N.D.'s level of need but that its usual providers had a freeze on admissions due to staffing shortages.  Accordingly, Dr. Warner made referrals in New England to placements that contracted with DCYF and placements that did not.  Doctor Warner expanded her search outside of New England, conducting research to identify new out-of-state placements.  DCYF made approximately thirty referrals, but only one referral, Mount Prospect Academy in New Hampshire, accepted N.D.  Mount Prospect Academy could not, however, immediately place N.D. because it had a three- to four-month waiting list.

---

[3] Doctor Warner originally testified that St. Mary's would be an appropriate placement for girls with N.D.'s level of need if she had an individualized education plan.  Saint Mary's is a nonprofit agency that cares for children facing psychiatric illness, sexual abuse and trafficking, and special-education challenges. *About Us*, St. Mary's Home for Children, https://www.smhfc.org/about-us/ (last visited Apr. 3, 2024).  However, Dr. Warner later admitted that even St. Mary's would be unable to meet N.D.'s level of need because, at times, she required medication by intramuscular injection to subdue her.

Doctor Warner continued to conduct research to identify a placement for N.D. after she was accepted into Mount Prospect Academy. However, she testified that she was consistently hearing from placements that:

> "[E]verybody has a significant staffing concern * * * and so a lot of places have reduced capacity. Kids in every state * * * are not moving at the same rates that they would to be able to discharge, so it's causing a backlog. And we're seeing an increase in mental health in our adolescents, which is -- it's kind of the perfect storm where we have an increase in need and a lot of programs with reduced capacity."[4]

After hearing testimony and arguments, the hearing justice issued a bench decision. He found both witnesses to be credible and found that Dr. Warner and Ms. Sevigny had made reasonable efforts to comply with the court's order. However, he found that DCYF, as an agency, had not made reasonable efforts to comply with the court's order because DCYF's failure to provide adequate facilities to meet N.D.'s level of need for boys, but not for girls, was not reasonable. He rejected DCYF's

---

[4] As was acknowledged at oral argument, DCYF was attempting to find a placement for N.D. during the COVID-19 pandemic, a time in which there was a nationwide surge in mental-health problems among children and adolescents. In 2021, the United States Surgeon General released an advisory on mental health among youths, citing an "alarming increase in the prevalence of certain mental health challenges" in young people. Office of the Surgeon General, *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory* 3 (2021), https://www.hhs.gov/sites/default/ files/surgeon-general-youth-mental-health-advisory.pdf. For more information on the breadth of this problem *see* Lakshmi Radhakrishnan et al., *Pediatric Emergency Department Visits Associated with Mental Health Conditions Before and During the COVID-19 Pandemic—United States, January 2019–January 2022*, 71 Morbidity Mortal Wkly. Rep. 319 (2022).

defense that it was not presently possible to place N.D., stating that it was DCYF's statutory mandate to provide for the children under its care. He also reasoned that the existence of the facilities for boys with the same level of need as N.D. showed that DCYF had the ability to create an appropriate program, but had willfully declined to do so. He further noted that the Children's Bill of Rights requires that N.D. not be deprived of her civil rights without due process of law,[5] but that there had been a lack of due process in keeping N.D. in "*de facto* incarceration" until an appropriate placement was found. Finding that DCYF failed in its obligation to place N.D. in an appropriate residential placement within a reasonable time, the hearing justice found DCYF in contempt and sanctioned it $1,000 per day until she was placed in a "residential facility that is appropriate for her level of need * * *." He further ordered that the sanction be retroactive from the date of the order to place N.D. and that, once the child had been placed, the contempt would be purged.[6]

After the finding of contempt, DCYF remained unable to find an appropriate placement for N.D. Instead, in February 2022, N.D. was discharged from Bradley

---

[5] The Children's Bill of Rights, codified at G.L. 1956 § 42-72-15, provides in pertinent part that "[n]o child placed or treated under the supervision of [DCYF] in any public or private facility shall be deprived of any personal property or civil rights, except in accordance with due process." Section 42-72-15(a).

[6] As will be explained *infra*, there is some disagreement regarding the date the hearing justice ordered N.D. to be placed. Although the instruction that N.D. be placed "forthwith in a residential treatment facility" first appeared on a November 9, 2021 Dependency and Neglect Action (DNA) Hearing Sheet, the formal order instructing the same was not entered until December 6, 2021.

Hospital to her mother with wraparound, in-home services.[7] This arrangement lasted nearly two months, before N.D. was readmitted to Bradley Hospital following a suicide attempt. On December 22, 2021, DCYF filed a timely appeal of the contempt order.[8]

## Standard of Review

"Both the Legislature and this Court have recognized that the Family Court, although a statutory court, has inherent power to punish contempt of its authority

---

[7] The wraparound process involves "'wrapping' a comprehensive array of individualized services and support networks 'around' young people in the community, rather than forcing them to enroll in predetermined, inflexible treatment programs." Office of Juvenile Justice and Delinquency Prevention, *Wraparound Process* 1 (Apr. 2014), https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/wraparound_process.pdf. When providing wraparound services, a care coordinator organizes the development of a customized treatment program with input from the child, the family, and the child's service providers, and then coordinates across agencies to implement the treatment program in the community. *Id.* at 2-3. Wraparound services can include things like in-home therapy, medication management, psychiatric assessment, family therapy, and substance abuse counseling. *Id.* at 1.

[8] DCYF filed its notice of appeal on December 22, 2021, after the December 10 contempt hearing, but before the contempt order was entered on January 5, 2022. However, although DCYF filed its notice of appeal prior to the entry of the Family Court's order, "it is well settled that 'this Court will treat a premature appeal as if it had been timely filed.'" *State v. Baillargeron*, 58 A.3d 194, 197 n.5 (R.I. 2013) (brackets omitted) (quoting *Azevedo v. State*, 945 A.2d 335, 337 n.4 (R.I. 2008)). Therefore, DCYF's notice of appeal, filed before the contempt order was entered, was timely. *See id.* This Court will not, however, consider an issue on appeal "for which a notice of appeal never was filed." *State v. Hallenbeck*, 878 A.2d 992, 1020 (R.I. 2005). Accordingly, although DCYF takes issue with the hearing justice ordering that the sanction be placed in an escrow account for the benefit of N.D. on March 17, 2022, that issue is not properly before the Court because that is a separate order from which DCYF has not appealed. *See id.*

- 8 -

* * *." *Porter v. Porter*, 684 A.2d 259, 261 (R.I. 1996); *see also* G.L. 1956 § 8-6-1 (codifying the Superior Court's power to punish those in contempt of its authority); G.L. 1956 § 8-10-38(a) (conferring like powers upon the Family Court "as are conferred upon the [S]uperior [C]ourt by the provisions of § 8-6-1"). "A contempt finding requires a party to demonstrate, 'by clear and convincing evidence, that a sufficiently specific order of the court has been violated.'" *Harris v. Evans*, 250 A.3d 553, 560 (R.I. 2021) (quoting *Town of Coventry v. Baird Properties, LLC*, 13 A.3d 614, 621 (R.I. 2011)). We accord "'great deference to a trial justice's finding of contempt,' and we will not disturb those findings unless they are clearly wrong or the trial justice abused his or her discretion." *Id.* (brackets omitted) (quoting *Town of Coventry*, 13 A.3d at 621). "Nor will this Court 'substitute our reading of the evidence for that of the trial justice if the record supports the [trial] justice's findings.'" *Id.* (quoting *Now Courier, LLC v. Better Carrier Corp.*, 965 A.2d 429, 434 (R.I. 2009)). "Findings of fact in a contempt hearing will not be disturbed unless they are clearly wrong or the trial justice abused his or her discretion." *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 704 (R.I. 1994).

When reviewing the sanction imposed for civil contempt, this Court's review "is limited to a review of the order to ensure that the terms are reasonable." *Moran v. Rhode Island Brotherhood of Correctional Officers*, 506 A.2d 542, 544 (R.I.

1986). "We apply a *de novo* standard of review, however, to questions of law * * *." *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 464 (R.I. 2008).

## Discussion

As an initial matter, this Court must address the apparent confusion regarding which order DCYF was adjudged to have willfully violated. The Office of the Child Advocate (OCA),[9] CASA, and N.D.'s mother assert that DCYF was adjudged in contempt of the court's November 9, 2021 order, while DCYF asserts that it was adjudged in contempt of the court's December 6, 2021 order. At oral argument, DCYF further represented to the Court that it is a common practice in the Family Court for a written decree or order to enter several weeks after the hearing date, with the understanding that it relate back to the hearing date.

A review of the record reveals that there was no formal order entered on November 9, 2021, the date of the hearing. Instead, a Dependency and Neglect Action (DNA) Hearing Sheet was entered on the docket, which was signed by the hearing justice and included the handwritten instruction that the child was "ready for discharge * * * [and] shall be placed forthwith in a residential treatment facility that

---

[9] The Office of the Child Advocate (OCA) consists of an appointed child advocate and staff who are responsible for reviewing DCYF operations. G.L. 1956 §§ 42-73-1 to -7. The OCA's duties include reviewing the facilities where children are placed and recommending changes in the procedures for providing childcare and treatment. Section 42-73-7(4), (5). The OCA is authorized to "[t]ake all possible action including * * * formal legal action, to secure and ensure the legal, civil and special rights of children * * *." Section 42-73-7(6).

is appropriate for her level of need."[10]  The handwritten instructions appeared under the subheading "Decree or Order" and in the section for "Other Conditions."  These instructions were not reduced to a formal, written order and entered by the court until December 6, 2021.

The November 9, 2021 DNA Hearing Sheet and the December 6, 2021 order do not differ in substance but do contain slightly different language.  Under the "Other Conditions" section of the DNA Hearing Sheet, the hearing justice wrote "child is ready for discharge – notice to child advocate child shall be placed forthwith in a residential treatment facility that is appropriate for her level of need."  The DNA Hearing Sheet also stated under the "Reason for Continuance" section that "DCYF to fund independently any facilities requiring self-referral, not an issue (insurance)."  By comparison, the December 6, 2021 order stated:

> "[I]t is hereby:
>
> "**ORDERED, ADJUDGED AND DECREED**
>
> "1. That [N.D.] is placed at Bradley Hospital and is ready for discharge.
> "2. That [N.D.] shall be placed forthwith in a residential treatment facility that is appropriate for her level of need.
> "3. That DCYF shall fund directly any appropriate program that requires self-referral.
> "4. That the Child Advocate's office shall be notified regarding the circumstances of this case.

---

[10] DNA Hearing Sheets are utilized by the hearing justice in dependency and neglect matters.  The document is handwritten and signed by the hearing justice and kept in the court's record.

"5. That the case is continued for further review on November 16, 2021.
"6. That a permanency hearing is scheduled on May 3, 2022.

"ENTERED as a Decree of this Honorable Court this 6th, day of December 2021[.]"

This Court has frowned upon the use of event hearing sheets as decrees or orders because such a practice lacks clarity. *See In re Ephraim L.*, 862 A.2d 196, 199 n.6 (R.I. 2004). In this case, the Family Court entered formal decrees in some instances, while in other instances it relied upon its hearing sheets to issue instructions to the parties.[11] DCYF contends that it is the practice of the Family Court to rely upon hearing sheets as orders and to apply its formal decrees retroactively to the date of the hearing. This practice is neither prohibited nor authorized by the Rhode Island Rules for Juvenile Proceedings. However, in the context of a contempt proceeding, "[i]t is well settled that for a restraining order to be enforceable * * * it should be clear and certain and its terms should be sufficient to enable one reading the writ or order to learn therefrom what he may or may not do thereunder." *Biron v. Falardeau*, 798 A.2d 379, 382 (R.I. 2002) (internal

---

[11] A review of the record reveals that prior to the finding of contempt, the Family Court issued instructions to the parties by means of DNA Hearing Sheets seven times, and formal orders were issued only three times. In some instances, the orders replicated the instructions written on an earlier DNA Hearing Sheet, but in other instances, the formal orders contained additional items not appearing on the DNA Hearing Sheet. None of the orders, including the December 6, 2021 order, were entered *nunc pro tunc*.

quotation marks and brackets omitted). "Clarity is a guiding principle in the scheme of judicial contempt, and 'derives from the concepts of fairness and due process.'" *In re Court Order Dated October 22, 2003*, 886 A.2d 342, 349 (R.I. 2005) (quoting *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991)). "The question of clarity does not even arise if one is not put on notice that the order is in place." *Id.*

In the instant case, the November 9, 2021 DNA Hearing Sheet reflects that the hearing justice clearly instructed the parties that the "child shall be placed forthwith in a residential treatment facility that is appropriate for her level of need." This instruction was a "[c]ondition[]" of the hearing justice's "Decree or Order," and it was signed by the hearing justice and filed with the court. Further, the parties do not contend that they were unaware of the court's instructions on the November 9, 2021 DNA Hearing Sheet.

Although the hearing justice clearly expected his order to be followed as of November 9, 2021, no court order was entered until December 6, 2021. *See Vecchio v. Women & Infants Hospital*, 293 A.3d 842, 848 (R.I. 2023) (noting that the court speaks through its orders, rather than other informal means). When the order was entered, it was not entered *nunc pro tunc*, and it was not identical to the instructions that were given on the November 9, 2021 DNA Hearing Sheet. We are troubled by the lack of consistency in the record regarding the use of DNA Hearing Sheets, the failure to enter orders *nunc pro tunc*, and the discrepancies between the court's

- 13 -

instructions on the DNA Hearing Sheets and its subsequent orders.[12] For this Court to conduct any meaningful review of a civil contempt finding, an order must be entered. *See In re Court Order Dated October 22, 2003*, 886 A.2d at 349 ("The question of clarity does not even arise if one is not put on notice that the order is in place."). Therefore, the order of December 6, 2021, is the controlling document.

DCYF argues that the hearing justice erred in finding DCYF in contempt for failing to meet is statutory obligations, rather than violating the court's order. It further contends that the hearing justice erred in finding DCYF in contempt for failing to develop a psychiatric residential treatment facility for girls in Rhode Island because, while the development of such a facility is a long-term goal of the agency, it did not have the present power to do so. DCYF argues that, because the hearing justice found that Dr. Warner and Ms. Sevigny had made reasonable efforts to comply with the court's order, it established its present inability to comply with the court's order. Further, DCYF argues that the evidence otherwise demonstrated that compliance was not within its power because N.D.'s particular needs and the lack of facilities providing psychiatric residential treatment created a "'perfect storm' during the mid-COVID period." In response, CASA and N.D.'s mother argue that

---

[12] In this case, there was no question that all parties, CASA, N.D.'s mother, and the OCA, were all interested in holding DCYF's feet to the fire relative to the placement order, and yet there was significant delay in entering the court's order. When the order was entered, it was not entered *nunc pro tunc*; therefore, it did not apply retroactively to the November 9, 2021 hearing date.

- 14 -

the hearing justice did not err because inconvenience, annoyance, adverse economic impact, and good-faith efforts do not show that compliance was not possible. They further argue that DCYF cannot claim that it was unable to place N.D. in an appropriate placement when it has the statutory obligation to do so.

The OCA argues that the hearing justice did not err because, pursuant to *Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790 (1st Cir. 1982), evidence of efforts to comply is not proof that compliance was not possible. It thus contends that DCYF's evidence that it made nationwide referrals, followed up, and updated placements with medical records, was insufficient to show that it was not possible to obtain a placement through further efforts. Relying on *Palmigiano v. DiPrete*, 700 F. Supp. 1180 (D.R.I. 1988), the OCA further argues that DCYF should not be permitted to claim it was unable to comply because it was on notice of the lack of adequate facilities for adolescent girls with N.D.'s needs. It contends that this notice, coupled with DCYF's statutory obligation to attend to the mental-health needs of all children in its care, precludes DCYF's ability to claim that complying with the court's order was not possible.

"A finding of civil contempt must be based on a party's lack of substantial compliance with a court order, which is demonstrated by the failure of a party to 'employ the utmost diligence in discharging its responsibilities.'" *Gardiner v. Gardiner*, 821 A.2d 229, 232 (R.I. 2003) (brackets and deletion omitted) (quoting

*Durfee*, 636 A.2d at 704).  In the instant case, DCYF admitted that it had not complied with the court's December 6, 2021 order.  Therefore, the issue before this Court is whether the hearing justice erred in rejecting DCYF's defense that compliance was not possible.  "It has generally been accepted that inability to perform in accordance with an order * * * is an excuse or justification that will prevent the holding of a party in contempt." *Ross v. Ross*, 511 A.2d 987, 988 (R.I. 1986).  "[I]n order to avoid an order of the court, an individual must demonstrate that he or she is literally unable to comply because compliance is not presently within his or her power." *Zannini v. Downing Corporation*, 701 A.2d 1016, 1018 (R.I. 1997).  The burden of proving a present inability to comply with a court order "is a heavy one, and mere inconvenience or annoyance is insufficient." *Id.*  Evidence of the noncomplier's diligence and good faith in attempting to comply is relevant, but not conclusive, in determining whether that party had the present ability to comply. *See Fortin*, 692 F.2d at 796-97.

There is no question that the state, through DCYF, has "a basic obligation to promote, safeguard and protect the social well-being and development of the children of the state through a comprehensive program providing for * * * [s]ocial services and facilities for children who require guidance, care, control, protection, treatment, or rehabilitation * * *." G.L. 1956 § 42-72-2(2).  It is equally apparent that DCYF was aware of its ongoing challenges in finding appropriate placements

for Rhode Island girls who presented with N.D.'s level of need. While there are two psychiatric residential treatment programs in Rhode Island for boys who present with N.D.'s level of aggression and self-injurious behavior, there are none for girls. As a result, N.D. languished for nearly eight months, vacillating between improvement and regression, before DCYF was forced to discharge her home to her mother, instead of an appropriate psychiatric residential treatment facility because, even after months of looking far and wide, there were no beds available. In light of this disparity, the hearing justice found that it "shocks the conscience" to have two psychiatric residential treatment facilities for boys, but none for girls. We share in the hearing justice's frustration.

Nevertheless, the systemic failure to develop a psychiatric residential treatment facility for girls is not dispositive of the narrow issue of whether DCYF had the present ability to comply with the court's order as of the December 10, 2021 hearing date. *See Zannini*, 701 A.2d at 1018. Unlike the situation in *Fortin* and *Palmigiano*, here the hearing justice was not tasked with deciding whether DCYF was in contempt of an order requiring it to bring its operations into compliance with its statutory or constitutional obligations. *See Fortin*, 692 F.2d at 792-94; *Palmigiano*, 700 F. Supp. at 1182, 1190-92. *Fortin* and *Palmigiano* were class-action suits alleging that an agency had failed to meet certain statutory or constitutional mandates. *See Fortin*, 692 F.2d at 792; *Palmigiano*, 700 F. Supp. at

1182-83. Therefore, the issue in those cases was whether the agencies had the ability to comply with their constitutional or statutory obligations—as set forth in the courts' respective orders—given that the agencies had years of notice that their operations were deficient. *See Fortin*, 692 F.2d at 792-93; *Palmigiano*, 700 F. Supp. at 1182-83, 1190-91. In the instant case, the sole issue was whether DCYF had the present ability to place a single child, N.D.,[13] in light of the particular circumstances of her case. *See Zannini*, 701 A.2d at 1018; *Ross*, 511 A.2d at 988.

The hearing justice rejected DCYF's inability defense because he found that it was DCYF's statutory mandate to provide for the children under its care and because there were appropriate facilities for boys but not for similarly situated girls. By examining whether DCYF should have been able to comply with the court's order in light of its statutory obligations, rather than whether DCYF had the present ability to find an appropriate placement for N.D. in the unique circumstances of this case, the hearing justice erred as a matter of law. *See Zannini*, 701 A.2d at 1018; *Ross*, 511 A.2d at 988.

---

[13] The Court is cognizant that N.D. was not the only child whom DCYF was unable to place during this time, having heard oral argument on a similar case—DCYF's appeal of a contempt order holding it in contempt for failing to place another child, N.B., in the fall of 2021—on the same day. These two cases were being heard in the Family Court contemporaneously. Nevertheless, no class of aggrieved children was formed, and no special master was appointed to investigate DCYF's operations in either case.

- 18 -

The hearing justice found that Dr. Warner and Ms. Sevigny had both expended reasonable efforts in complying with the court order. He noted the difficulty that DCYF faced finding N.D. a placement due to her high level of need—specifically "the fact that she has needed intramuscular medication or injections in order to subdue her aggressive behavior." He further credited Dr. Warner's testimony that N.D. was repeatedly denied from placements because of her history of self-injurious behavior. He found that there are no facilities in Rhode Island that would take a girl with N.D.'s level of need and that DCYF was forced to look out of state. He acknowledged that the other states had waiting lists, and that the only facility that accepted N.D. had a waiting list of approximately three to four months. Moreover, he found credible Dr. Warner, who testified that staffing concerns, low discharge rates, and an increase in mental-health issues among adolescents created a "perfect storm" whereby programs had an increase in need, but a reduction in capacity.

Therefore, taking into account the hearing justice's findings, to which we must give deference, DCYF demonstrated that it was "literally unable to comply because compliance [was] not presently [in its] power[,]" given the unavailability of an appropriate placement due to N.D.'s needs, ongoing staffing issues, and the increase in mental-health problems among adolescents. *See Zannini*, 701 A.2d at 1018; *Durfee*, 636 A.2d at 704. Accordingly, although DCYF was in technical violation of the Family Court's December 6, 2021 order, we determine that the agency was

unable to comply.  Therefore, we need not address the remaining issues raised by DCYF.

## Conclusion

For the foregoing reasons, the order of contempt is vacated, and the papers are remanded to the Family Court for further proceedings.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re N.D. |
| **Case Number** | No. 2022-59-Appeal. (PJ 21-1688) |
| **Date Opinion Filed** | April 15, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Felix E. Gill |
| **Attorney(s) on Appeal** | For Petitioner: <br><br> Lauren E. Jones <br> Department of Children, Youth and Families |
| | For Respondent: <br><br> Andrew J. Johnson <br> Court Appointed Special Advocate <br><br> Diana C. Robbins <br> Office of the Child Advocate |